**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jessie P. BARNETT, Jr., Barnett & Sons
Salvage, Ltd. and Billy D. Hicks,
Defendants-Appellants.**

No. 77–5811.

United States Court of Appeals,
Fifth Circuit.

Jan. 8, 1979.

Grady F. Tollison, Jr., Mary Ann Connell, Oxford, Miss., for Barnett, Barnett & Sons, etc.

Charles S. Gibson, Dermott, Ark., for Hicks.

H. M. Ray, U. S. Atty., Alfred E. Moreton, III, John R. Hailman, Asst. U. S. Attys., Oxford, Miss., Barry Blyveis, Assoc. Chief Cnsl., Food & Drug Adminis., Rockville, Md., for plaintiff-appellee.

Before COLEMAN, CLARK and RUBIN, Circuit Judges.

COLEMAN, Circuit Judge.

When Theodore Roosevelt was President of the United States, the misbranding and harmful adulteration of foods had become of such nationwide moment that Congress enacted the first Food and Drug Act, 1906.

Eight years later, in an appraisal of the Act, the Supreme Court said:

> The statute upon its face shows, that the primary purpose of Congress was to prevent injury to the public health by the sale and transportation in interstate commerce of misbranded and adulterated foods. The legislation, as against misbranding, intended to make it possible that the consumer should know that an article purchased was what it purported to be; that it might be bought for what it really was, and not upon misrepresentations as to character and quality. As against adulteration, the statute was intended to protect the public health from possible injury by adding to articles of food consumption poisonous and deleterious substances which might render such articles injurious to the health of consumers. If this purpose has been effected by plain and unambiguous language, and the act is within the power of Congress, the only duty of the courts is to give it effect according to its terms. This principle has been frequently recognized in this court.

*United States v. Lexington Mill Company,* 232 U.S. 399, 409, 34 S.Ct. 337, 340, 58 L.Ed. 658 (1914).

At a later point in that opinion the Court said:

> Congress has here, in this statute, with its penalties and forfeitures, definitely outlined its inhibition against a particular class of adulteration.

232 U.S. at 411, 34 S.Ct. at 340.

From time to time the Act has been amended in the light of new developments and with a view to more effectively protecting the general public from foods which may be harmful or which have been misbranded. We have no doubt that the various provisions of the Act are plain, that they suffer from no ambiguity amounting to impermissible vagueness, and that they do not violate the Constitution.

The grand jury for the Northern District of Mississippi indicted Jessie P. Barnett, Jr., Billy D. Hicks, and Barnett & Sons Salvage, LTD., for criminal violations of these statutes, as well as for a conspiracy to commit those violations.[1]

---

1. Count 2 charged that on or about September 12, 1975, all three defendants did knowingly, with *intent to defraud and mislead,* cause to be introduced into Interstate Commerce at Tunica, Mississippi, adulterated bulk cottonseed meal, a food, "which was adulterated in that it contained an added poisonous and deleterious substance, to-wit, mercury, which may have rendered it injurious to health, and contained unsafe food additives, to-wit, the fungicide PCNB

A jury convicted all three defendants on all six counts.

Hicks was sentenced to three years imprisonment on one count, with eligibility for parole after nine months; also to a fine of $1,000 and three years probation on each of the remaining counts, the periods of probation to run concurrently with each other.

On Count 1, Barnett was sentenced to imprisonment for six months and to pay one-half of the cost of prosecution; also to pay a fine of $1,000 and three years probation on each of the remaining counts, the periods of probation to run concurrently with each other.

Barnett & Sons Salvage Company, LTD., was fined $250 on each of the six counts.

All defendants have appealed. We affirm as to all.

The action began on September 1, 1975, when Hicks made an arrangement with the Planters Oil Mill, Inc., of Tunica, Mississippi, in which it was agreed that the Mill would receive cottonseed which had been poison-treated for planting purposes, process it into cottonseed meal, and deliver the meal to the railroad agent at Tunica for transportation to various customers in Interstate Commerce. It was further agreed that from this operation the cost of processing and shipping would first be deducted, after which the parties would split the profits, if any. Shipment of the treated seed *to* Planters began on September 2, contained in bags, marked "Poison-treated—Do not use for food, feed, or oil".

In the meantime, Hicks had made a separate arrangement with Jessie P. Barnett, Jr., of Barnett & Sons Salvage Company, LTD., in which Barnett agreed that his Company would find buyers for the meal processed from the treated planting cottonseed.

On September 9, Barnett made a contract with Southern Feed Ingredients Company, a company which deals solely in components for animal feed, by which Barnett was to sell Southern 1,000 tons of cottonseed meal. The record is not clear as to whether Barnett knew initially that the meal was to be manufactured from treated seed, but there is no doubt that he soon learned of it. The serious aspect of this case is that Barnett never informed Southern at any time that the meal was to be processed from cottonseed which had been poison-treated for planting purposes.

At various times and on various dates, within the time period alleged in the indictment, Planters processed the treated cottonseed, loaded the resulting meal onto railroad cars, and consigned the cars to the railroad agent at Tunica. The bills of lading contained the warning, *Fertilizer use only.* Copies of those bills of lading were sent to Barnett & Sons and to Southern.

It was during this period that Mr. Barnett really stuck his hand in the fire by representing to Southern that the warnings appearing on the bills of lading were erroneous, that the meal was fit for animal feed. The invoices from Planters, sent to Hicks and to Barnett & Sons Salvage Company, LTD., bore the warning *"Fertilizer, chemical or industrial use only"*. Not stopping at this, Planters notified both Hicks and Barnett & Sons, by certified letter, return receipt requested, that the Mill had begun consigning meal to the railroad agent and that "we want it fully understood that the products from these seed are only good for fertilizer, chemical or industrial use."

On the dates alleged in the indictments Southern directed the railroad agent to ship

---

(pentachloronitrobenzene) and the insecticide Disyston (O, O-diethyl S-(2-Enthylthio) ethyl) phosphorodiathioate, in violation of Sections 331(a), 333(b), 342(a)(1), 342(a)(2)(C), and 348 of Title 21, and of Section 2 of Title 18 of the United States Code".

Counts 3, 4, and 5 charged the defendants with committing the same offenses on September 19, 1975, and September 22, 1975.

Count 6 charged all defendants with knowingly, and with intent to defraud and mislead, offering for sale and causing to be offered for sale 1,000 tons of misbranded cottonseed meal processed from poison-treated cottonseed, theretofore shipped in Interstate Commerce to Tunica, Mississippi.

Count 1 charged a conspiracy to commit the offenses charged in the remaining counts.

the meal to various customers, as therein charged.

Matters lost no time in coming to a head. One of Southern's customers complained "that the meal had a burned or dark color, and a burned smell". Southern then told Planters to send a sample of the meal to a laboratory in Memphis for analysis. On September 19 the samples were sent. On September 25, the laboratory reported that the samples contained "less than .01 parts per million" of Disyston. The report, however, did not indicate that any test had been conducted for mercury or for PCNB.

The customer also submitted samples of the meal to the state laboratory at Mississippi State University. On September 22, this laboratory notified the customer that the meal samples contained Disyston. The customer then recalled all of the meal that could be traced and shipped it back to Southern. It informed Southern of the situation and also informed Mississippi feed inspectors, as well as investigators for the Food and Drug Administration, that the meal was tainted.

The Food and Drug Administration investigators took samples of the meal at Planters, in Tunica, and from all places to which the meal had been shipped or at which could be found in transit. Tested by Food and Drug Administration laboratories, these samples revealed the presence of mercury, PCNB, and Disyston.

### HICKS

Mr. Hicks complains first that the statutes in question are unconstitutional. We have already pointed out the holding of the Supreme Court in *United States v. Lexington Mill Company*, 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658 (1914).

■ We agree that, most assuredly, criminal statutes must fairly apprise those who are subject to them as to the conduct which is proscribed.[2] Even so, "no more than a reasonable degree of certainty can be de-

manded", *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952).

■ We can attribute no merit whatever to the contention that the statutes left the defendants without fair warning that their acts were illegal. 21 U.S.C. § 331(a) prohibits the "introduction or delivery for introduction into interstate commerce of any food . . . that is adulterated . . ." 21 U.S.C. § 342(a)(1) defines an adulterated food as one bearing or containing "any poisonous or deleterious substance which may render it injurious to health". 21 U.S.C. § 321(f) specifies that the term " 'food' means . . . articles used for food or drink for man or other animals . . . ."

Hicks testified that only by analysis could it be determined whether it would be safe to feed the meal. This does not help him. The cottonseed meal in this case was sold for feed prior to analysis and this was done with Hicks' knowledge. The facts, as previously stated herein, reflects the warnings received by Hicks that the product was unfit for animal feed.

■ Mr. Hicks complains that he was prejudiced by overly extensive expert testimony adduced on behalf of the government with reference to the harmful effects of mercury, PCNB, and Disyston. Our evaluation of the trial record, however, leaves us with the firm conviction that the rulings of the trial court on the materiality and relevancy of this testimony were well within its discretion, *United States v. Grimm*, 5 Cir. 1978, 568 F.2d 1136, 1138; *United States v. Brown*, 5 Cir. 1977, 547 F.2d 1264, 1266. Indeed, if Hicks thought that the extensiveness of the proof as to these rather indisputable facts would put the case out of focus, to his prejudice, he could easily have eliminated the hazard by merely stipulating the harmfulness, putting an end of the matter. On the other hand, if there was any doubt about it, the government was entitled to nail it down.

---

2. *United States v. Hawes*, 5 Cir. 1976, 529 F.2d 472, 479; *United States v. Insco*, 5 Cir., 1974, 496 F.2d 204, 208.

## BARNETT

Jessie P. Barnett, on his own behalf and that of Barnett & Sons Salvage, LTD., urges reversal of their convictions on the grounds of improperly admitted evidence, an allegedly improper notice of an evidentiary fact, insufficient evidence, and improper consideration of a pre-sentence report.

### A. *Admissibility of Evidence*

█ Twelve railcars of meal were shipped from Planters. By the time the FDA could obtain samples for its tests, meal from three of these cars had been commingled with meal from other sources. Over objection, the District Court admitted samples from all twelve cars, including the three cars containing commingled meal. Barnett contends that the samples taken from the three commingled cars were irrelevant and the admission of the samples constitutes reversible error. We disagree.

This argument tries to slough off the fact that there were nine carloads of meal in which there had been no commingling and even as to the three in which there had been commingling, some of the meal had been processed from the Hicks-Barnett treated cottonseed. The samples from all twelve cars revealed the presence of the deleterious substances in question. Even if it was error to admit the samples from the three commingled cars, it was obviously harmless beyond a reasonable doubt and we need not pause for a prolonged discussion of this point.

### B. *Insufficient Evidence*

█ Barnett maintains that due to his good faith reliance on the Barrow-Agee test that there was insufficient evidence of intent to commit a felony and therefore that his motion for judgment of acquittal should have been granted.

Viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the facts simply do not support this argument. Barnett had received copies of bills of lading, invoices, and a letter from Plant-

ers, warning in unequivocal terms that the meal was not to be used for animal feed. Barnett assured Southern that the copies of bills of lading bearing the warning "Fertilizer use only" were in error and that the meal was good for feed use.

Moreover, the record shows that samples were not sent to Barrow-Agee for analysis until September 17, 1975, where they were received on September 19. The Barrow-Agee report was not issued until September 25, 1975. Barnett's assurance to Southern that the meal was safe for feed use took place prior to September 19. All twelve railcars had been shipped from Planters by the time the Barrow-Agee report was issued. Barnett could not have been relying on the Barrow-Agee report when he misled Southern because the report was not yet in existence.

The argument that Barnett acted in good faith cannot, on this record, be sustained.

### C. *Judicial Notice of the Absence of Tolerance Standards*

█ At the close of the government's proof in rebuttal, and at the continued behest of the prosecution, the District Court told the jury:

Now, members of the jury, the court takes judicial notice that no regulations prescribed by any governmental agency provide for standards or tolerances relating to the presence of mercury, PCNB, and disyston as components, as allowable components, to be contained in cottonseed meal manufactured and intended to be used for animal feed, that there are no regulations on the subject that have been prescribed allowing the presence of these elements in cottonseed meal intended for consumption in animal feed.

On cross-examination of government witnesses, the defendants attempted to create the impression that there is a government-authorized tolerance level for mercury, PCNB, and disyston. They never proffered evidence of any such tolerances but they repeatedly cross-examined government witnesses as to whether there were such stan-

dards. At one point, pursuant to the government's request, the Court directed defense counsel to present the tolerance standards if they were available. Barnett's counsel responded that he only had "some notes" but wanted to ask some questions concerning tolerances "for the later testimony". The Court permitted him to continue.

At the conclusion of the expert testimony, the government moved the Court to take judicial notice of the absence of tolerances because "it has been made an issue of fact on some of the cross-examination." Barnett's counsel protested on the ground that "it was clear the [Environmental Protection Agency] does in fact have guidelines." The Court deferred ruling until it could examine the regulations. At the conclusion of the government's case-in-chief the government again moved the Court to take the desired judicial notice. An extended discussion ensued in chambers. The Court again deferred ruling. During a weekend recess the Court studied the statutes and regulations and, after the close of rebuttal proof for the government, gave the instruction as above quoted.

In the calmness of judicial review we do not understand exactly how the trial court allowed the government to prevail in this request that it take judicial notice. The defendants had offered no proof that the tolerance standards existed. There was nothing to rebut. The defense had a right to cross-examine the government witnesses in a search for evidence that such standards might exist, but this was far from establishing that they did exist. The defendants having wholly failed to establish the existence of any standards, it would seem hardly necessary that the Court should have entered the lists on the side of the government by informing the jury at the close of the evidence that, as a matter of fact, the standards did not exist. If the government

thought that the failure of proof carried with it significantly adverse consequences, it should have had no real trouble producing a qualified witness, in chief, who could have testified that an examination of the Federal Register failed to reveal the existence of any such standards. All of this is especially true when it is remembered that it is not necessary for the government to prove a negative, *see, e. g., Rogers v. United States*, 8 Cir. 1966, 367 F.2d 998, *cert. denied*, 386 U.S. 943, 87 S.Ct. 976, 17 L.Ed.2d 874 (1967).[3]

We do not approve the procedure followed here, but, for several reasons, we decline to reverse these convictions on this point.

In the first place, there is not the slightest contention that *what the District Court told the jury was incorrect.* In the second place, the defendants provoked the situation by pursuing the point on cross-examination when they knew, or by investigation of the Federal Register should have known, there were no such tolerance standards. Lastly, it may be said that since the statement was true and the government was under no obligation to prove it in the first place, the error was harmless beyond a reasonable doubt.

### D. *Sentencing Procedure*

The pre-sentence report contained information relative to a prior sale by Barnett of soybean meal which had been processed from beans that had been treated with mercury. A copy of the report was furnished to Barnett and counsel prior to sentence. The trial court thoroughly explored the subject matter of the report with Jessie P. Barnett, Jr. and his counsel. Barnett pointed out that there had been no conviction as a result of this incident, but he did not dispute the basic facts as reported. He claimed that the poisoned soybean meal had

---

3. "The general principle, and we think the correct one, * * * is that it is not incumbent on the prosecution to adduce positive evidence to support a negative averment the truth of which is fairly indicated by established circumstances and which, if untrue, could be readily disproved by the production of documents or other evidence probably within the defendant's possession or control. (Cases cited.)"

*Rossi v. United States*, 1933, 289 U.S. 89, 91–92, 53 S.Ct. 532, 533, 77 L.Ed. 1051, 1052.

been mixed with untreated meal and thereafter shipped to a customer by a third party without Barnett's consent. Barnett said that he had fully cooperated with FDA investigators concerning the matter. Thereupon, the District Court announced that it would request the probation service to make a further investigation into the matter and would give further consideration to the sentence imposed on Count 1 should the Court learn anything "substantially different" within the next thirty days.

Barnett's counsel subsequently filed a motion for reduction of sentence. This motion was supported by affidavits to the effect that the earlier incident occurred through the unintentional and unauthorized intermingling of meal processed from treated beans, with meal processed from uncontaminated beans.

On December 27, 1977, the District Court denied the motion on the ground that there was "no basis in fact for the alteration" requested.

It is undisputed that the sentencing procedure followed by the District Court was in accordance with the requirements of Rule 32(c)(3)(A) of the Federal Rules of Criminal Procedure. Barnett contends, however, that F.R.Crim.P. 32(c)(3)(A) failed to accord Barnett those safeguards required as a matter of due process. Specifically, he says that "consideration of the unsworn accusations of a governmental investigative agent over Defendant's total denial of such accusations" contravenes the requirements of the Fifth Amendment to the United States Constitution; that anything less than a full evidentiary hearing constitutes a denial of due process.

These arguments must be rejected.

■ A sentencing judge "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446–47, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). For example, in the landmark case of *Williams v. New York*,

337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), a state sentencing procedure whereby the judge considered information obtained "outside the courtroom from persons whom the defendant has not been permitted to confront or cross-examine" was found not to be constitutionally infirm. *Id.* at 245. Writing for the *Williams* Court, Mr. Justice Black observed that the information necessary for an

> intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination . . . [such considerations] admonish us against treating the due process clause as a uniform command that courts throughout the Nation abandon their age-old practice of seeking information from out-of-court sources . . . .

*Id.* at 250, 251, 69 S.Ct. at 1084.

■ The *Williams* Court, of course, did not hold that the sentencing judge's discretion is unlimited. A defendant has a right to "at least minimal safeguards to insure that the sentencing court does not rely on erroneous factual information", *United States v. Espinoza*, 5 Cir. 1973, 481 F.2d 553, 555; *see United States v. Tucker, supra* at 447, 92 S.Ct. 589; *Townsend v. Burke*, 334 U.S. 736, 740, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948). Thus we have held that where a defendant disputes information considered in imposing a sentence, the defendant must be given "at least some opportunity to rebut that information", *United States v. Espinoza, supra* at 556; *see United States v. Ashley*, 5 Cir., 555 F.2d 462, 466, *cert. denied*, 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977); *Shelton v. United States*, 5 Cir. 1974, 497 F.2d 156, 160. *See also United States v. Rollerson*, 5 Cir. 1974, 491 F.2d 1209, 1213; *United States v. Battaglia*, 5 Cir. 1972, 478 F.2d 854.

■ The right of rebuttal does not require that the sentencing hearing be transformed into a second trial. *See United States v. Espinoza, supra* at 558. *See also United States v. Weston*, 9 Cir. 1971, 448 F.2d 626, 633, *cert. denied*, 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972). At a mini-

mum it is sufficient if the sentencing judge affords the defendant an opportunity to "comment on any alleged factual inaccuracy." *United States v. Brice*, 5 Cir. 1977, 565 F.2d 336, 337; *United States v. Hodges*, 5 Cir. 1977, 547 F.2d 951, 952; *United States v. Ashley, supra.*

Barnett does not contend that he was not afforded an opportunity to rebut the information contained in the pre-sentence report. What he claims is that he "did rebut" it. He therefore argues that the right of rebuttal was insufficient; "anything less than a full evidentiary hearing constitutes a denial of due process". This argument, of course, is knocked from its feet by *Williams v. New York, supra.*

Reliance on *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Mempa v. Rhay*, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); and *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), is misplaced. These cases held that due process applied to the sentencing stage of a criminal proceeding, but this only begins the due process inquiry, for "[O]nce it is determined that due process applies, the question remains what process is due", *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), *cited in Gardner v. Florida*, 430 U.S. 349, 358 n. 9, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

As a matter of due process, a defendant about to be sentenced is not entitled to the same evidentiary protections, such as the right to cross-examine adverse witnesses in a sentencing proceeding, as are available in a trial on guilt or innocence.

In this case, Barnett was fully informed of the contents of the pre-sentence report. He was given every opportunity to state his version of the matter, and he did so. That is the end of it.

## CONCLUSION

The judgments of the District Court, as to all appellants, are

AFFIRMED.