### UNITED STATES of America, Plaintiff–Appellee,

v.

### JoAnn MITCHELTREE, Defendant–Appellant.

### No. 89–6406.

United States Court of Appeals, Tenth Circuit.

July 24, 1991.

Richard M. Wintory, Special Asst. U.S. Atty. (Timothy D. Leonard, U.S. Atty. and Merri L. Hankins, Asst. U.S. Atty., with him on the brief), Oklahoma City, Okl., for plaintiff-appellee.

Jill M. Wichlens, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the brief), Denver, Colo., for defendant-appellant.

Before McKAY, ANDERSON and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

By superseding indictment, defendant-appellant JoAnn Mitcheltree was indicted in five of ten counts of an indictment charging, in pertinent part, seven defendants with various offenses arising out of the alleged distribution of the drug methylenedioxymethamphetamine or MDMA. After a jury trial, defendant was convicted on three counts: (1) count four, introducing a misbranded drug into interstate commerce with the intent to mislead or defraud, 21 U.S.C. §§ 331(a) & 333(a)(2),[1] (2) count one,

---

1. 21 U.S.C. § 333(a)(2) was formerly designated § 333(b). Although the parties have cited the former designation, we cite the current one. 21 U.S.C. § 333 now provides:

**Penalties**
**(a) Violation of section 331 of this title; second violation; intent to defraud or mislead**
(1) Any person who violates a provision of section 301 [21 U.S.C. § 331] shall be imprisoned for not more than one year or fined not more than $1,000, or both.

(2) Notwithstanding the provisions of paragraph (1), if any person commits such a violation after a conviction of him under this section has become final, or commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000 or both.

conspiracy to commit this offense, 18 U.S.C. § 371,[2] and (3) count ten, witness tampering, 18 U.S.C. § 1512(b)(3).[3] Defendant was acquitted on count two, conspiracy to distribute a controlled substance analogue, 21 U.S.C. §§ 813 & 846. The jury was unable to reach a verdict on count nine, another witness tampering count, and upon motion of the government that count was dismissed with prejudice.

Counts one and four occurred before the effective date of the Sentencing Guidelines, and the district court sentenced defendant to six months imprisonment on each count. Defendant was sentenced in accordance with the Guidelines on count ten because the offense occurred after their enactment; based upon a total offense level of fifteen and criminal history category of II, she was sentenced to twenty-one months imprisonment, and to an additional consecutive month for committing an offense (count ten) while on release, 18 U.S.C. § 3147. The sentences on counts one and four ran concurrently with one another and with the sentence on count ten; accordingly, defendant was sentenced to a term of twenty-two months.[4]

Defendant was represented by retained counsel at trial. With one exception, appellate counsel has not pursued the points preserved as potential error by trial counsel; rather, appellate counsel pursues, under a plain error theory, claims which were not raised at trial.[5] Usually, an appellate court will not set aside a judgment based upon errors which were not brought to the attention of the trial court. *United States v. Atkinson*, 297 U.S. 157, 159, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). Fairness and efficiency considerations counsel against noticing such errors when the opportunity to present them has passed. *Id.* Fed.R. Crim.P. 52(b) tempers this somewhat by providing that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Errors may be noticed for the first time on direct appeal "if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings." *Atkinson*, 297 U.S. at 160, 56 S.Ct. at 392. This power is reserved for "exceptional circumstances," *id.*, and it "is to be used sparingly, solely in those circumstances in

2. 18 U.S.C. § 371 provides:

   **Conspiracy to commit offense or defraud the United States**

   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

   If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

3. 18 U.S.C. § 1512(b)(3) provides:

   **Tampering with a witness, victim, or an informant**

   ....

   (b) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

   · · · · ·

   (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to

the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

4. The district court and this court denied bail pending appeal. Defendant began serving her sentence on January 20, 1990. Subsequently, appellate counsel was appointed for her, briefing was completed and the case came on for oral argument in November 1990. On December 21, 1990, the merits panel *sua sponte* reconsidered the earlier order denying bail pending appeal and instructed the district court to set conditions of release in accordance with 18 U.S.C. § 3143(b). *See United States v. Daily*, 921 F.2d 994, 998 (10th Cir.1991) (merits panel granted bail pending appeal after oral argument).

5. As a general rule, when appellate counsel rejects completely those errors claimed by trial counsel in favor of a different avenue on appeal, we must be cautious of a "tendency to seize upon errors which, removed from context, take on an aspect of seriousness which they never had below." 8B J. Moore, *Moore's Federal Practice* ¶ 52.03 (1991).

**1334**

which a miscarriage of justice would result." *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 163 n. 14, 71 L.Ed.2d 816 (1982).

■ Even if error did occur, we review plain error claims against a backdrop of the entire record to determine whether the error was sufficient to "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985). To find reversible plain error, we must be satisfied that the error not only affected substantial rights in a serious way, but also that the "error had an unfair prejudicial impact on the jury's deliberations." *Id.* at 16–17 n. 14, 105 S.Ct. at 1047 n. 14. "Only then would a court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice." *Id.* Consequently, plain error is " 'both obvious and substantial.' " *United States v. Jefferson,* 925 F.2d 1242, 1254 (10th Cir.1991) (quoting *United States v. Brown,* 555 F.2d 407, 420 (5th Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978)).

■ An error of constitutional significance may be "noticed more freely than less serious errors." *See* 3A C. Wright, *Federal Practice & Procedure* § 856 at 336, 342 (1982 & 1990 Supp.); *Jefferson,* 925 F.2d at 1254. Notwithstanding, many constitutional errors are "not prejudicial per se." 8B J. Moore, *Moore's Federal Practice* ¶ 52.03 (1990). Rather, under *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), many constitutional errors may be deemed harmless and not reversible when a reviewing court is "able to declare a belief that it was harmless beyond a reasonable doubt." *See also United States v. Rivera,* 900 F.2d 1462, 1469–70 (10th Cir.1990) (en banc) (discussing differing standards of review for nonconstitutional and constitutional claims).[6] The harmless error doctrine em-

bodies the oft-stated concept that the Constitution only requires that a defendant receive a fair trial, not a perfect one, and the "virtually inevitable presence of immaterial error" does not impair a jury's resolution of the central inquiry in every criminal trial: "the factual question of the defendant's guilt or innocence." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986).

On appeal, defendant contends that (1) the district court admitted evidence concerning a surreptitiously recorded conversation between a government informant and the defendant, in violation of defendant's sixth amendment right to counsel, (2) trial counsel rendered ineffective assistance by failing to move for the suppression of that evidence, (3) the district court erred by not defining "misleading conduct" in the jury instructions concerning witness tampering, (4) the district court should not have considered defendant's witness tampering conviction as an offense committed while on release for purposes of enhancement under 18 U.S.C. § 3147, and (5) insufficient evidence supports the conviction on counts one and four of the indictment (the MDMA misbranding counts) because the government did not demonstrate an intent to mislead or defraud a natural person or a government agency pursuant to 21 U.S.C. § 333(a)(2). We reverse.

As for the counts involving MDMA offenses, we agree with the defendant that her sixth amendment right to counsel was violated by the introduction of her surreptitiously taped conversation with the government's informant. However, we need not reach the issue of whether the introduction of these statements constituted plain error because we reverse the MDMA convictions (counts one and four) on other grounds and remand for a new trial.

As for the witness tampering count conviction (count ten), we hold that evidence of the taped conversation is a product of the sixth amendment violation concerning the

**6.** In habeas cases involving the sixth amendment right to counsel, the Court has followed the "harmless beyond a reasonable doubt" standard in determining prejudice. *Moore v. Illi-*nois, 434 U.S. 220, 232, 98 S.Ct. 458, 466, 54 L.Ed.2d 424 (1977); *Milton v. Wainwright,* 407 U.S. 371, 377–78, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1972).

MDMA counts, notwithstanding that the government's purpose was to investigate the separate offense of witness tampering. Upon a proper suppression motion, the taped conversation should have been excluded as evidence on count ten, given the charge (contained in the government's bill of particulars) that defendant misled her pretrial services officer concerning the substance of the conversation. Even absent proper objection, we still must reverse and remand for a new trial on count ten because we cannot say that this constitutional error was harmless beyond a reasonable doubt.

Because we reverse and remand for a new trial on count ten, we do not consider defendant's arguments that the district court erred by (1) failing to define misleading conduct in the jury instructions [7] and (2) enhancing her sentence under 18 U.S.C. § 3147; nor do we resolve the *ex post facto* sentencing guideline problem suggested by defendant on appeal. Likewise, given our disposition, we need not consider defendant's claim of ineffective assistance of counsel.

Returning to MDMA counts one and four, we hold that while sufficient evidence exists concerning defendant's intent to mislead or defraud consumers, by no means does the record contain sufficient evidence of misleading or defrauding a government agency. We reject the government's assertion that, for purposes of 21 U.S.C. § 333(a)(2) and 18 U.S.C. § 371, an intent to defraud a local police department by selling misbranded drugs is a sufficient basis to sustain convictions of this nature. Because the case was submitted to the jury on either theory (misleading consumers or defrauding a government agency including a local police department) and a general verdict form was used, we cannot tell on which theory or theories the jury convicted. Accordingly, defendant's convictions on

MDMA counts one and four must be reversed and remanded for further proceedings.

## I. Facts

The events in this case involve MDMA, a "designer drug" sometimes known as "ecstasy," which did not become subject to federal controlled substance penalties until October 27, 1986. MDMA is a controlled substance analogue. As such, it produced effects similar to various controlled substances, but differed enough to fall outside the classification of existing controlled substances. Rec. supp. vol. VI at 871–73. The government's efforts to schedule MDMA as a controlled substance did not fare well initially. Pursuant to 21 U.S.C. § 811(h), the DEA sought to schedule temporarily MDMA as a schedule I controlled substance. 50 Fed.Reg. 22,119 (1985). In *United States v. Spain*, 825 F.2d 1426 (10th Cir.1987), we held that this attempted temporary scheduling was invalid because the DEA had not been subdelegated the authority [8] and that an order scheduling the drug had not been timely issued. *Id.* at 1429. *See also United States v. Caudle*, 828 F.2d 1111, 1113 (5th Cir.1987) (holding MDMA temporary scheduling procedurally defective). A final rule placing MDMA in schedule I, effective November 13, 1986, 51 Fed.Reg. 36,552 (1986), was vacated for further agency consideration. *Grinspoon v. Drug Enforcement Adm'n*, 828 F.2d 881, 898 (1st Cir.1987).

As a controlled substance analogue, MDMA was treated as a schedule I controlled substance as of October 27, 1986. The Controlled Substance Analogue Enforcement Act of 1986, Pub.L. 99–570, tit. I, subtit. E, § 1202, 100 Stat. 3207–13 to 3207–14 (Oct. 27, 1986), provided that a controlled substance analogue intended for human consumption would be treated as a

---

**7.** On retrial of count ten, the district court should include the pertinent provisions of the statutory definition of misleading conduct, 18 U.S.C. § 1515(b)(3), as well as other pertinent definitions contained in § 1515.

**8.** We later determined that neither the Attorney General nor the DEA had been lawfully delegat-

ed the authority for temporary scheduling. *United States v. Widdowson*, 916 F.2d 587, 591, 594 (10th Cir.1990). The Supreme Court subsequently held both delegations lawful, contrary to our interpretation. *United States v. Touby*, —— U.S. ——, 111 S.Ct. 1752, 114 L.Ed.2d 219 (May 20, 1991), *aff'g*, 909 F.2d 759 (3d Cir.1990).

schedule I controlled substance. 21 U.S.C. § 813. Effective March 23, 1988, however, MDMA was permanently scheduled in schedule I as a controlled substance. 53 Fed.Reg. 5,156 (1988).

Defendant began using and distributing MDMA in the summer of 1985, before it was scheduled as a controlled substance analogue.[9] After being indicted in 1989 for her activities in connection with MDMA, defendant was arraigned and eventually released on bond. In the order setting conditions of release, the defendant was directed to initial each condition which applied. One of the conditions marked as applicable, but not initialed by the defendant, was a requirement that she "avoid all contact with persons[ ] who are considered either alleged victims or potential witnesses[ ]." Two lines, apparently for the purpose of naming the potential witnesses, were left blank. Although the defendant signed the order setting conditions of release, the pretrial services officer indicated that it was possible that defendant was not made aware of the condition prohibiting contact of potential witnesses, given that defendant did not initial. Rec. supp. vol. VII at 1099. However, the pretrial services officer also testified that defendant indicated that "her attorney had advised her not to talk to anybody that might be a potential witness." *Id.* at 1078. *See also id.* at 1105.

9. Leslie Lynn Ricks testified that defendant introduced Ricks to codefendant Samuel Raymer as a source for MDMA. Rec. supp. vol. V at 724, 727. Ricks frequently called defendant to find out when Raymer would be in town so Ricks could purchase MDMA for resale. *Id.* at 727.

Extensive testimony about the MDMA distribution network came from Kevin Volk, defendant's one-time boyfriend. He testified that defendant introduced him to MDMA in July 1985, telling him and a friend that "it was all natural, it would make you feel great." Rec. supp. vol. V at 424. Volk then became a regular consumer and distributor. By November 1985, at Confetti's nightclub in Oklahoma City, Volk would take money from purchasers and exchange it for MDMA tablets from Raymer; Volk indicated that he observed defendant doing the same, selling to customers including informant B.J. Rizzo and Ruth House. *Id.* at 445–46. Defendant's sale of MDMA tablets at Confetti's nightclub is corroborated by House, who purchased MDMA from defendant, *id.* at 638, and Rizzo, who purchased MDMA from defendant and Volk, and sometimes sold MDMA for defendant and Volk, receiving payment-in-kind. *Id.* supp. vol. VII at 1034.

According to Volk, defendant indicated that Raymer was willing to expand the operation by "fronting" MDMA to her for distribution. *Id.* supp. vol. V at 448. Under this arrangement, Raymer, having been arrested in Texas, no longer flew to Oklahoma City. *Id.* at 449. Instead, he drove, stayed with Volk and defendant, and

[h]e [Raymer] would provide us the pills at the beginning of the weekend when he arrived. We would sell them throughout the weekend. When he got ready to leave, we would have to pay him for the pills sold and give him the remaining pills.

*Id.* at 448–49, 450. According to Volk, by the end of 1985 and the beginning of January 1986, he and defendant sold four- to five-hundred MDMA tablets per week. *Id.* at 451. Raymer would bring the tablets in large, unmarked white containers which could hold about one-thousand pills and Raymer, Volk and defendant would transfer the tablets into smaller plastic bags. *Id.* at 453–54, 456.

In February 1986, undercover detective James Osborne, through an informant, arranged for the purchase of fifty tablets of MDMA from defendant at Confetti's nightclub. Rec. supp. vol. V at 572–74. The detective testified that he purchased forty-nine tablets for $784. *Id.* at 575. The exchange occurred in the nightclub parking lot, with the informant handing the tablets to the detective. *Id.* at 575. Defendant first requested that the detective actually place the money in her purse. *Id.* The detective testified that he had encountered such arrangements many times in the covert drug trade. Drug dealers frequently deal through another party, not directly transferring drugs or accepting money from the purchaser. Defendant mistakenly thought that it "would not be any type of illegal activity as long as she did not personally hand the evidence or take the money from [an unknown law enforcement agent]." *Id.* at 577.

By late-April 1986, Raymer left MDMA with Volk and defendant to distribute and collect money on Raymer's behalf. *Id.* at 465. By May 1986, Raymer arranged with defendant to send the money by express mail in care of Raymer's mother's trucking company. *Id.* at 467. According to Volk, defendant would obtain drafts or money orders at the post office in her name, and they would send them to Raymer. *Id.* at 468.

After Raymer was arrested a second time in Texas, Volk and defendant lacked a supplier. *Id.* at 469. By August 1986, Volk testified that defendant had contacted Raymer, arranging for MDMA mailing. *Id.* at 469–70. During August and September 1986, defendant and Volk received MDMA tablets through the mail or by delivery from Raymer. *Id.* at 473–74.

While released, defendant contacted her friend, B.J. Rizzo, a potential witness. Rizzo, a hairstylist, had been a participant in defendant's MDMA distribution network, being paid in-kind. Rizzo's father had cut defendant's hair four or five times over a four-year period and Rizzo had assisted by shampooing. In June 1989, Rizzo coincidentally met defendant at the Varsity Sports Grill in Oklahoma City. Defendant inquired whether Rizzo had been contacted by Detective Randy Yarborough of the Oklahoma City Police Department, who had been investigating MDMA distribution in Oklahoma City. Rizzo replied that she had not. Rizzo also told defendant that she was working at a new hair styling salon about to have its grand opening.

A few weeks later, Rizzo received a call from defendant while at the salon. According to Rizzo, defendant inquired whether she had heard from Detective Yarborough. Rizzo volunteered that she had. Defendant then scheduled a hair appointment for June 26, 1989. Rec. supp. vol. VII at 1052. Rizzo testified that she did not know what to do, so she called the detective. The detective then contacted Richard Wintory, the prosecutor. An agreement was reached whereby Rizzo would secretly tape her conversation with defendant during the hair appointment. According to Rizzo, the purpose was "[t]o see if she [defendant] was going to try to change my testimony." *Id.* at 1054.

The prosecutor advised defendant's pre-trial services officer that defendant may have contacted a female witness. He further advised that someone would take the witness's statement and that the pretrial services officer should review, with the de-

fendant, defendant's conditions of release, including the condition that defendant not contact potential witnesses. That review would not occur until after the taping of the conversation on June 26.

The transcript of the June 26 conversation between defendant and Rizzo contains many personal details about the defendant that one might reveal to a close friend. At least eight times during the conversation, Rizzo, using the ruse that the detective kept calling her and she needed defendant's advice, encouraged defendant to talk about the pending MDMA charges. Defendant gave a variety of responses, sometimes ambiguous, and in the process discussed her views concerning the government's case, including codefendants, and whom Rizzo might implicate by her testimony. Concerning Rizzo's status as a witness, defendant advised Rizzo to make the government subpoena her. The following exchange occurred:

> Rizzo: I don't know. (inaudible) I really don't want to talk to him [the detective]. But I know that I have to otherwise I'll have to go to court and I don't want to go to court.
>
> Defendant: You will have to go to court anyway.
>
> Rizzo: You think they got me down there as a witness?
>
> Defendant: They got you down on a grand jury thing as a witness, that you witness that Sampson [10] sold drugs.

Tr. 6/26/89 at 3. In the course of advising Rizzo about what to say to the detective, defendant discussed Rizzo's potential testimony against codefendant Raymer and defendant.[11] In a later taped conversation,

---

**10.** Sampson was the nickname of codefendant Samuel Scott Raymer.

**11.** The following exchange occurred:

> Rizzo: Man its gonna be hard for me to testify against Sampson when he's right in the room.
>
> Defendant: Yeah it is BJ, it's gonna be impossible for you to. You know what you need to tell them you just did 'em every now and then. If I were you I'd say, you don't even have to say you got yours from Sampson.
>
> Rizzo: I really didn't though. He gave me, the only time that he gave me drugs was the time

that we were in Dallas. Is the only time JoAnn.

> Defendant: Then that's what you need to tell 'em BJ.
>
> Rizzo: They, I never, and he gave 'em to me he didn't sell 'em to me. He gave 'em to me.
>
> Defendant: Then that's what you need to tell 'em.
>
> Rizzo: But [...]
>
> Defendant: Where did you get 'em? Did you get most of your shit from (inaudible).
>
> Rizzo: Um-hmm.
>
> Defendant: You better change that story.

(Footnote 11 continued on pg. 1338)

Rizzo requested further advice using the same ruse. Defendant suggested that she retain a lawyer and offered to assist with the fee.

On July 5, 1989, defendant met with her pretrial services officer. The officer inquired whether defendant had been in contact with any potential witnesses. Initially, defendant said no, but when told that by the officer that the officer had received contrary information, defendant thought about it for a moment and said that she had been in contact with Rizzo.

Prosecutor: What happened next?

Officer: We proceeded to talk—I cannot recall verbatim the conversation but, in general, she stated that she had been in to see B.J. [Rizzo] recently to get her hair done and that in getting her hair done, B.J. had stated that she had not been contacted by anybody in law enforcement since JoAnn's [defendant's] arrest but that she thought she was going to be cooperating and that she probably needed to get an attorney.

Rec. supp. vol. VII at 1077. According to the officer, defendant explained that: (1) Rizzo thought she needed an attorney; (2) Rizzo had been her hairdresser for the last three to five years and that she saw her on a regular basis; and (3) she and Rizzo did not discuss the case. *Id.* at 1078–79. Defendant inquired where the officer's information had come from and the officer identified prosecutor Wintory as the source. According to the officer, defendant "said 'Well, don't tell Wintory about this,' something to the effect, 'I'm in enough trouble,' or something, but, 'Don't tell Mr. Wintory about this.'" *Id.* at 1079–80.

Concerning the relationship between Rizzo and defendant, the officer understood that Rizzo was defendant's "hairdresser of longstanding, that she had been seeing her on a regular basis for many years." *Id.* at 1082. This was based in part on the defendant's remarks at the July 5 meeting:

Officer: After we talked for a while and she [defendant] was ready to leave, she—I told her I would be talking to her next week and she said, well, next time you see me, if my hair looks rather scraggly, it will be because she hadn't been to the hairdresser and we kind of laughed about that she did have pretty hair and that I would see her next week.

*Id.* at 1080. A violation of a defendant's conditions of release is reported to an appropriate judicial officer by the pretrial services officer. The officer in this case testified that in deciding whether a violation occurred it would have been significant to her that (1) "[June 26, 1989] was the only time she [defendant] had gone to Ms. Rizzo to have her hair cut," and (2) defendant had inquired into the substance of Rizzo's testimony. *Id.* at 1083.

Prior to trial, the government was ordered to provide defendant a bill of particulars concerning count ten.[12] Rec. supp. vol. I, doc. 77, doc. 111. The government indicated that the federal offense involved was defendant's witness tampering with Rizzo and the condition of release violated was a prohibition on contact with government witnesses. According to the government, defendant engaged in several acts of misleading conduct or corrupt persuasion toward the pretrial services officer: (1) initially denying that she contacted a government witness; (2) after admitting the contact with Rizzo, falsely claiming that Rizzo

---

Tr. 6/26/89 at 15–16. Rizzo testified that during the inaudible portion, the defendant pointed to herself and said, "'From me'[?]" Rec. supp. vol. VIII at 1139.

**12.** Count ten of the superseding indictment provided:

That on or about July 5, 1989, in Oklahoma City, Oklahoma County, within the Western District of Oklahoma,

..JO ANN MITCHELLTREE [sic]..

the defendant herein, did knowingly, corruptly persuade, and engaged in misleading conduct or attempt to do so, with the intent to hinder, delay and prevent the communication by [pretrial services officer] Cynthia Cranford to a law enforcement officer or a Judge of the United States of information relating to the commission or possible commission of a federal offense,

All in violation of Title 18, United States Code, Section 1512(b)(3).

had been cutting defendant's hair for five years; (3) indicating that no substantive discussion of the case had occurred; (4) not disclosing that she had advised Rizzo to withhold names of coconspirators who had distributed MDMA to Rizzo; and (5) requesting that the officer not inform the prosecutor of the defendant's contact with Rizzo.

## II. Sixth Amendment Right to Counsel

On a plain error theory, defendant contends that her incriminating statements elicited by Rizzo should have been suppressed as violative of her sixth amendment right to counsel.

### A.

The sixth amendment right to counsel "does not attach until after the initiation of formal charges." *Moran v. Burbine*, 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986); *accord United States v. Gouveia*, 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984) ("right to counsel attaches at the initiation of adversary judicial criminal proceedings"); *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment"). The right to counsel applies to pending charges but not to "other and different charges against the same defendant." *Hoffa v. United States*, 385 U.S. 293, 308, 87 S.Ct. 408, 416, 17 L.Ed.2d 374 (1966). Thus, a defendant's incriminating statements concerning pending charges surreptitiously coaxed by the government in the absence of counsel may not be used in prosecuting those charges. *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). However, other incriminating statements pertaining to different crimes may be used in a subsequent trial of those crimes. *Maine v. Moulton*, 474 U.S. 159, 180 n. 16, 106 S.Ct. 477, 489 n. 16, 88 L.Ed.2d 481 (1985). *Accord Moran*, 475 U.S. at 431, 106 S.Ct. at 1146.

Where no charges have been filed regarding the subject of interrogation, the sixth amendment right to counsel does not attach. *Illinois v. Perkins*, —— U.S. ——, 110 S.Ct. 2394, 2399, 110 L.Ed.2d 243 (1990). But once charges have been filed, the defendant is in a different position because the right to counsel has attached on those charges. *Id.* The purpose of the sixth amendment is to afford a defendant a "right to rely upon counsel as a 'medium' between him and the State." *Moulton*, 474 U.S. at 176, 106 S.Ct. at 487. The government has an "affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right." *Id.* Whether a sixth amendment violation has occurred must be evaluated in light of this affirmative obligation. *Id.* The government is not precluded from utilizing incriminating statements obtained from the defendant as a result of "luck or happenstance." *Id.* Proscribed is "obtain[ing] incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Id.*

At the time the government elicited the statements in question (June 26, 1989), defendant had been indicted on count one, alleging a conspiracy to commit an offense against the United States, 18 U.S.C. § 371, and specifically introducing misbranded MDMA in interstate commerce with intent to mislead and defraud, 21 U.S.C. § 333(a)(2). *See* Rec. supp. vol. XII, doc. 6/7/89. Defendant also had been indicted on count two, conspiracy to distribute MDMA, a controlled substance analogue, 21 U.S.C. §§ 813, 846. *See* Rec. supp. vol. XII, doc. 6/7/89. Thus, defendant's right to counsel had attached on the two MDMA conspiracy counts. It had not attached on count ten, the witness tampering charge.

The government argues that a "separate offense" exception to the sixth amendment applies in this case. *Perkins*, 110 S.Ct. at 2399; *Moulton*, 474 U.S. at 176, 106 S.Ct. at 487. According to the government, the defendant was not im-

mune from investigation or prosecution for witness tampering during the pending MDMA case, a proposition with which we agree. *See United States v. Terzado–Madruga*, 897 F.2d 1099, 1111–12 (11th Cir. 1990). Also, according to the government, the defendant has failed to establish that the government deliberately circumvented her right to counsel on the pending MDMA charges.

The government explains that defendant "launched into further criminal activity while under indictment. Specifically, while on pretrial release, she made arrangements to visit with a government witness whom she had no significant contact for years, for the ostensible purpose of having her haircut, but only after first ascertaining that the witness had been contacted by law enforcement." Appellee's Brief at 24. According to the government, "the detective recognized the fact pattern—the defendant meant to attempt to influence the government witness and had in fact taken definitive steps towards implementing her criminal intent." *Id.*

About two weeks after informant Rizzo and the defendant met by chance at the Varsity Sports Grill, the detective contacted Rizzo. Rizzo "did not want to get in any trouble," rec. supp. vol. VII at 1050, so she agreed to discuss the whole case, including information about defendant Samuel Raymer. After being contacted by defendant for a hair appointment, Rizzo contacted the detective. The detective and the government prosecutor, Mr. Wintory, then cooperated in investigating the defendant's predisposition for witness tampering. *Id.* at 1076, 1093–94. After a series of meetings between Rizzo and the detective, Rizzo was wired and ready to tape the conversation. According to Rizzo her purpose was "[t]o see if she [defendant] was going to try to change my testimony." *Id.* at 1054.

### B.

We have carefully reviewed the transcript, the taped conversation and the trial testimony. Though a confidential informant, Rizzo's actions must be evaluated as those of a government agent subject to the limitations of the sixth amendment. *Hoffa*, 385 U.S. at 311, 87 S.Ct. at 418. Defendant argues that "[t]he statements elicited and introduced by the government amount to a confession by [defendant] Mitcheltree that she had engaged in a conspiracy to distribute MDMA." Appellant's Brief at 29 n. 9. We think that defendant's characterization may be somewhat overstated, but we cannot ignore the incriminating implications of defendant's statements concerning her co-conspirators and her own distribution and consumption of misbranded MDMA. *See, e.g.,* tr. 6/26/89 at 13 ("I got it for people but I wasn't that huge [a drug dealer]. . . ."); at 16 ("I know I used to give you most of them [MDMA tablets]"; "Anything you got from me I pretty much gave you."); at 21 ("I was an x-freak"). Defendant's taped statements concerning misbranded MDMA cannot be categorized as the product of "luck or happenstance." Rather, during the course of the conversation, Rizzo asked the defendant broad, open-ended questions about the subject matter of the charged offenses. At least seven times, Rizzo sought the defendant's advice as to what she should say and do in connection with the investigation. *See, e.g., id.* at 2 ("I don't know what to say JoAnn."); ("But, I mean, what do you think I should say?"); at 3 ("So I don't know what to do."); at 7 ("Well, what do you think we should do then?"); at 16.

Rizzo also asked about defendant's testimony and her knowledge of the conspiracy. *See, e.g., id.* at 7 ("Now are you testifying against Sampson?"); ("Well, I need to ask you a question, what about the Lobaughs?"); at 8 ("Who's Lynn [Ricks]?"). Rizzo admitted that she elicited conversation about the drug trade, rec. supp. vol. VIII at 1208, and this included names of other coconspirators and activities highly relevant to the conspiracies charged. Although the government contends that Rizzo never pressed for details on the MDMA counts, her repeated, open-ended questions made it virtually certain that defendant would discuss the details of the pending MDMA counts. Equally important, the government's informant prompted defendant to discuss her trial strategy vis-a-vis

the other alleged coconspirators with comments like "JoAnn, if you don't testify against Sampson you're gonna get thrown in jail." *Id.* at 13.

■ Rizzo was more than a passive listener; she exercised skill at leading the conversation into particular topics and prompting particular replies. *See United States v. Henry*, 447 U.S. 264, 271 n. 9, 100 S.Ct. 2183, 2187 n. 9, 65 L.Ed.2d 115 (1980). Merely because Rizzo and defendant were in a non-custodial setting does not bar a finding of deliberate elicitation. *Id.* at 273 n. 11, 100 S.Ct. at 2189 n. 11. Concerning the charged MDMA counts, we strongly believe that the government breached its affirmative obligation not to circumvent defendant's sixth amendment right to counsel. Here, the government's purpose in taping the conversation was to see if defendant would attempt to influence Rizzo's possible testimony. Rather than investigating a crime which had occurred, the government sought to determine whether defendant would commit a crime while she was being taped. The government is free to investigate suspected criminal activity, even in advance of the commission of a crime. But such investigation must proceed with due regard for the government's affirmative obligation not to defeat sixth amendment rights which have attached. That due regard was not present in this

case: in an effort to lead the defendant into witness tampering, Rizzo inquired into the pending charges in more than a tangential way, and violated the defendant's sixth amendment rights on the pending MDMA charges.[13]

■ The government also learned defendant's mistaken views concerning the likelihood of her conviction and the tack she planned to take concerning the prosecutor. *See, e.g.,* tr. 6/26/89 at 14–15, 17, 19–20. Whether the government had legitimate reasons for investigating witness tampering is beside the point. *Moulton,* 474 U.S. at 180, 106 S.Ct. at 489. The taped conversation reveals that the government deliberately elicited statements which the defendant had the right not to make prior to consulting with counsel. *Terzado–Madruga,* 897 F.2d at 1111.

Where proper objection has been made, statements concerning pending counts obtained in violation of a defendant's sixth amendment right to counsel are inadmissible in a trial concerning those counts. *Moulton,* 474 U.S. at 180, 106 S.Ct. at 489. The government contends that defendants taped statements were not offered in support of the MDMA counts; however, the record contains no such limiting instruction. *See* rec. supp. vol. VIII at 1137, 1144. Rather, the trial judge told the jury that

---

**13.** "This is not a case where ... 'the constable blundered,' *People v. DeFore,* 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926); rather, it is one where the 'constable' planned an impermissible interference with the right to assistance of counsel." *Henry,* 447 U.S. at 274–75, 100 S.Ct. at 2189. In this case, defendant refers us to trial testimony which strongly suggests that the prosecutor assisted in planning the events which led to the violation of defendant's sixth amendment right to counsel. *See* rec. supp. vol. VII at 1076, 1093–94. The prosecutor responds that he was "well within the bounds of" ethical conduct because a separate offense was being investigated which occurred prior to the initiation of criminal proceedings. Appellee's Brief at 26 n. 4. He relies upon *United States v. Ryans,* 903 F.2d 731 (10th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990). In *Ryans,* we held that DR 7–104(A)(1), which restricts lawyer communication with a client known to be represented by counsel, does not apply before the initiation of criminal proceedings. 903 F.2d at 740.

The prosecutor's argument ignores the June 7, 1989 indictment pending when the government planned these events. The defendant had obtained representation, as the prosecutor well knew. At best, the prosecutor took no steps to insure that the informant did not communicate with the defendant about the pending charges and consequently the defendant's sixth amendment right to counsel was compromised. This is inconsistent with a prosecutor's special responsibility concerning a defendant's representation by counsel. *See* R.Prof.Conduct 3.8(b), Okla.Stat.Ann. Tit. 5, Ch. 1, App. 3–A (West 1991). It also is inconsistent with R.Prof.Conduct 4.2 which provides: "In representing a client, a lawyer shall not communicate, *or cause another to communicate* about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has consent of the other lawyer or is authorized by law to do so." R.Prof.Conduct 4.2, Okla.Stat.Ann. Tit. 5, Ch. 1, App. 3–A (West 1991) (emphasis supplied).

the taped conversation would be received against defendant only. Trial counsel having failed to make a proper objection or seek a severance, we would next be required to evaluate this constitutional error on the MDMA counts to determine whether reversible or harmless error occurred. *See United States v. Wade,* 388 U.S. 218, 242, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149 (1967). However, because we reverse the MDMA counts of conviction (counts one and four) on other grounds, we do not undertake that evaluation.

### C.

Next we consider the relationship between the sixth amendment violation concerning the MDMA counts and the evidence relied upon to prove the witness tampering count conviction, count ten. Defendant's sixth amendment rights had not attached on count ten when the incriminating statements were made because she had yet to be indicted for witness tampering. However, she claims that any statements concerning count ten "were the direct result of the violation of [her] sixth amendment rights with respect to counts one and four, the MDMA charges." Appellant's Brief at 7.

We view defendant's derivative evidence (fruit of the poisonous tree) claim in light of the general rule that, even though a defendant's right to counsel has attached for indicted offenses, she still may be questioned without counsel concerning uncharged offenses. *Moran,* 475 U.S. at 431, 106 S.Ct. at 1146. "To hold that the government is prohibited from investigating the defendant's involvement in new crimes, simply because [her] right to counsel has attached for a separate offense, would be essentially to immunize a defendant from further prosecution." *Terzado–Madruga,* 897 F.2d at 1112. The sixth amendment does not require such a result, indeed, the government *should* investigate efforts to derail a pending prosecution such as witness or jury tampering or other attempts to obstruct justice. *Id.* This type of investigation does not require that defendant's counsel be present, but due regard must be shown for defendant's right to avoid uncounseled statements, deliberately elicited by the government, pertaining to pending charges. *Id.*

The government may violate a defendant's sixth amendment right to counsel when it deliberately elicits uncounseled statements about very closely related crimes which arise out of the same course of conduct as the charged offenses. *People v. Clankie,* 124 Ill.2d 456, 125 Ill.Dec. 290, 294, 530 N.E.2d 448, 452 (1988). This principle may apply when the government's investigation concerning a charged offense is incomplete for want of specific details. *Id.* In *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the defendant was charged with abduction, arraigned and confined when the police deliberately elicited uncounseled statements concerning the location of the victim's body. *Id.* at 390, 399–400, 97 S.Ct. at 1235, 1240. Thereafter, defendant was indicted for first degree murder; however, the Court determined that the sixth amendment right to counsel applied to the subsequent murder charge given the closely related prior abduction charge. *Id.* at 399, 97 S.Ct. at 1240.

Likewise, in *Moulton,* the defendant had been charged with theft by receiving certain vehicles and automotive parts. 474 U.S. at 162, 106 S.Ct. at 480. Thereafter, his sixth amendment right to counsel on the pending charges was compromised during an investigation which pertained in part to other crimes. 474 U.S. at 162, 106 S.Ct. at 480. Defendant was subsequently charged with burglary in relation to the same items; he was convicted of theft and burglary. *Id.* at 167, 106 S.Ct. at 482. In announcing the rule that "incriminating statements *pertaining* to pending charges are inadmissible at the trial of those charges," the Supreme Court affirmed the lower court disposition that the defendant's statements must be suppressed and a new trial granted on the charges of conviction, theft and burglary. *Id.* at 167–68, 180, 106 S.Ct. at 482–83, 489 (emphasis supplied). Thus, the Supreme Court did not permit the statements to be used for either offense—

the theft originally charged, or the burglary subsequently charged.

■ We believe that when a deliberate sixth amendment violation occurs concerning pending charges, the government may not use defendant's uncounseled incriminating statements at a trial of those or very closely related subsequent charges. *See Moulton,* 474 U.S. at 180, 106 S.Ct. at 489; *Brewer,* 430 U.S. at 398–99, 97 S.Ct. at 1239–40. Uncounseled incriminating statements about different uncharged offenses normally would be admissible at a later trial of those offenses. *Id.* n. 16. Thus, when the government violates a defendant's sixth amendment right to counsel on pending charges in the course of investigating other suspected crimes, and then issues a superseding indictment incorporating new charges on the suspected crimes, a prudent course is to sever the new charges from the old charges. *Terzado–Madruga,* 897 F.2d at 1111–12 (sixth amendment violation occurred on pending drug charges while government was investigating defendant's involvement in a murder-for-hire scheme; severance of new and old charges adequately protected defendant).

Here, the MDMA counts on which the sixth amendment violation occurred are theoretically distinct from the witness tampering count. The difficulty is the somewhat unconventional manner in which the government sought to prove witness tampering. Certain statements obtained in violation of defendant's sixth amendment right to counsel relate directly to both the MDMA counts and the witness tampering count. Defendant has chosen to proceed on a derivative evidence theory which we now address, keeping in mind the scope of defendant's sixth amendment right to counsel on the MDMA counts. The derivative evidence doctrine is implicated if challenged evidence concerning the witness tampering count is closely related in time and subject matter to the sixth amendment violation, in other words, if the challenged evidence is a product of the earlier exploitation of the constitutional violation. *See Hoffa,* 385 U.S. at 308–09, 87 S.Ct. at 416–17 (evidence of bribing jurors was not obtained through exploitation of an alleged sixth amendment violation concerning underlying charges; *held,* evidence was not derivative).

■ The derivative evidence doctrine has been applied in other sixth amendment right to counsel cases. *See, e.g., Nix v. Williams,* 467 U.S. 431, 442, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984); *United States v. Wade,* 388 U.S. 218, 241–42, 87 S.Ct. 1926, 1939–40, 18 L.Ed.2d 1149; *Terzado–Madruga,* 897 F.2d at 1112–13. Merely because incriminating evidence would not have been discovered but for the constitutional violation does not require exclusion. *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Instead, the core issue is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417 (citation omitted). Three exceptions to the derivative evidence doctrine have developed. First, facts obtained as a result of a constitutional violation still may be used at trial if they can be proven by a lawful source independent of the violation. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). Second, evidence which would have ultimately or inevitably been discovered by lawful means also is admissible. *Nix,* 467 U.S. at 444, 104 S.Ct. at 2509. Finally, if the causal connection between the constitutional violation and the evidence in question is so attenuated as to dissipate the taint, the evidence is admissible. *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939).

### D.

Normally, we review a district court's legal determinations on a suppression motion *de novo* and its factual findings under a clearly erroneous standard. *United States v. Soto–Ornelas,* 863 F.2d 1487, 1490 (10th Cir.1988). In this case, we lack

a trial court suppression hearing developing this derivative evidence claim because no objection was made below. In this unusual case, however, a remand for further factfinding is not necessary because the record contains the material facts and establishes as a matter of law that the sixth amendment violation concerning the MDMA counts (the taped conversation) became a primary basis for the offense contained in count ten. Stated another way, the circumstances of the constitutional violation evolved into another offense.

Count ten charged the defendant with engaging in several acts of misleading conduct toward Cynthia Cranford, the pretrial services officer (not the informant, B.J. Rizzo), with the intent to hinder communication by the officer concerning the commission of a federal offense. In other words, defendant was charged in count ten with misleading the officer about the nature of defendant's earlier conversation with Rizzo, as well as other acts of misleading conduct. These acts did not occur until nine days after the taped conversation with Rizzo, and were never mentioned, let alone contemplated, in the taped conversation. The taped conversation between Rizzo and the defendant largely concerns the then-pending MDMA counts.

In its bill of particulars on count ten, the government charged one of the acts of defendant's corrupt persuasion and misleading conduct as follows:

> After admitting the contact [between defendant and Rizzo] the defendant did mislead [pretrial services] Officer Cranford as to the purpose and content of her discussion with Ms. Rizzo by claiming falsely ... that there had been no substantive discussion of the defendant's pending case....

Rec. supp. vol. I, doc. 111 at 2, ¶ 2(ii). Thus, one of the charges on count ten was that defendant denied having discussed the merits of the pending case with Rizzo, after having been indicted.

The government relied upon the sixth amendment violation concerning the MDMA counts as part of the proof on count ten. *See, e.g.,* Rec. supp. vol. VII at 1083. Any doubt about the government's reliance is dispelled by the government's view of the case as outlined at closing argument:

> [A]nd finally, ladies and gentlemen, the [sic] is clear that she [defendant] engaged in misleading conduct with Officer Cynthia Cranford. She lead [sic] her to believe that witness Rizzo had been regularly cutting her hair from three to five years and *that they had not substantively discussed the case. You heard that conversation,* ladies and gentlemen. There is not by any reasonable stretch of the imagination a way you can characterize that conversation as not substantially discussing the case. *You heard the evidence.*

> . . . . .

> Ladies and gentlemen, the evidence is absolutely unquestioned in this case. Cynthia Cranford [the pretrial services officer] was misled by this defendant and the only motive, the only motive for this defendant to mislead Officer Cranford was to prevent her from communicating the information about her contacting witnesses, *discussing the substance of the case.* That's the only motive. That evidence is clear.

Rec. supp. vol. IX at 1440, 1503 (emphasis added). The substantive discussion of the MDMA counts between the government (through informant Rizzo) and the defendant was violative of defendant's sixth amendment right to counsel.

■■■ What the government asks us to do is to allow use of the uncounseled statements on the MDMA counts to prove that the defendant's subsequent account of those statements to the pretrial services officer was false. This we will not do. Plainly, the taped conversation, even though it was used for a slightly different purpose on the witness tampering count, is wholly a result of the sixth amendment violation on the MDMA counts. It is not a product of means sufficiently distinguishable so as to be purged of the sixth amendment violation on the MDMA counts, rather it is the *same* evidence. Thus, as far as proof on count ten, it is more than "closely

related" in time and subject matter to the underlying sixth amendment violation. *See Hoffa*, 385 U.S. at 309, 87 S.Ct. at 417.

We acknowledge *Moulton's* statement that "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." 474 U.S. at 180 n. 16, 106 S.Ct. at 489 n. 16. Here, the incriminating statements pertained to both the pending offenses and the other crime on which the sixth amendment right had not yet attached. We think that the Court implied that such multi-purpose evidence would be excluded when it rejected a rule that the sixth amendment would not apply when the police undertook investigation of a separate crime. *See Moulton*, 474 U.S. at 191–92, 106 S.Ct. at 45 (Burger, C.J., dissenting). *See also* W. LaFave & J. Israel, *Criminal Procedure* § 6.4 at 470 (1984 & 1991 Supp.). Although the Court recognized that police have an incentive to discover evidence pertaining to both the charged and uncharged offense, it reaffirmed that

> In seeking evidence pertaining to pending charges ... the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*.

*Moulton*, 474 U.S. at 179–80, 106 S.Ct. at 489. This emphasis on deterrence suggests that multi-purpose derivative evidence must be excluded in the trial of the uncharged offense in order to uphold the deterrence rationale. The derivative evidence doctrine, together with its exceptions, limits those cases in which exclusion is available, but this is clearly a case in which the government "seeks to maintain its right to avail itself of the knowledge obtained by that means which it otherwise would not have had." *Silverthorne Lumber*, 251 U.S. at 385, 40 S.Ct. at 182.

We must reverse the conviction on count ten and remand for a new trial because we cannot say that introduction of the defendant's statements (in the taped conversation) was harmless beyond a reasonable doubt. The proof on count ten consisted of the taped conversation and the testimony of two witnesses, the pretrial services officer and the informant. The jury could not reach agreement on count nine which charged the defendant with witness tampering vis-a-vis the informant. The jury may have questioned the credibility of the informant. The admissible proof on count ten, consisting of some testimony of the informant and the pretrial services officer, while sufficient, was by no means overwhelming.

### III. Sufficiency of the Evidence

Adopting the argument contained in co-defendant Raymer's appellate brief, defendant next contends that the evidence is insufficient to convict her on counts one and four of the indictment. Trial counsel raised this point on motion for judgment of acquittal. Rec. vol. I, doc. 205 at 3–6; supp. vol. VIII at 1330. Count one charged defendant and Raymer with participation in conspiracy to commit an offense against the United States, 18 U.S.C. § 371. The underlying offense was introducing misbranded drugs into interstate commerce and failing to register and provide information and notice about the MDMA, 21 U.S.C. § 331(a), (k) & (p), all with the intent to mislead or defraud, 21 U.S.C. § 333(a)(2). *See* rec. supp. vol. IX at 1360 (conspiracy falls under "commit any offense" portion of 18 U.S.C. § 371). The time period of the conspiracy was from June 1985 until April 1987, which predated in part the valid scheduling of MDMA as a controlled substance or controlled substance analogue. The government alleged that the MDMA was misbranded because it was distributed in interstate commerce without labels containing information such as the name and place of business of the manufacturer, packer or distributor and the name and quantity of the active ingredients. 21 U.S.C. §§ 352(b), (c) & (e). Additionally,

the government claimed that it was misbranded because it was health endangering and was manufactured in an unregistered establishment, 21 U.S.C. § 360, and because notice and informational requirements were not followed. 21 U.S.C. §§ 352(j) & (o). Count four was a substantive count charging the defendant and Raymer · with introducing misbranded drugs into interstate commerce in January 1986, 21 U.S.C. § 331(a), with intent to mislead or defraud, 18 U.S.C. § 333(a)(2).

We review the evidence and its reasonable inferences in the light most favorable to the government to determine "whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis omitted). The legal issue on this point is whether the government can establish a felony violation under 21 U.S.C. § 333(a)(2) on a theory that defendant, in committing violations under 21 U.S.C. § 331 such as misbranding, acted "with the intent to mislead or defraud" natural persons or government agencies. The jury was instructed that for conviction a defendant must act "with the specific intent to mislead or defraud natural persons to whom the drug was sold, or government agencies." Rec. supp. vol. I, doc. 288, instr. 11, 27. To uphold the verdict on these counts, we must determine that either theory is legally viable. We also may consider whether sufficient evidence supports each theory.

■ In making this argument, codefendant Raymer claims that the government did not proceed on the theory that he defrauded natural persons, but only government agencies. The evidence concerning defendant Mitcheltree, however, indicates that she acted with the intent to mislead or defraud at least one identified natural person concerning the composition of MDMA, coconspirator Kevin Volk.[14] While the record suggests that at least one of Raymer's distributers was aware of some of the negative effects of MDMA, rec. supp. vol. III at 108, it nowhere suggests that the unknown third persons supplied by the coconspirators in this case were informed of the actual nature of the drug. In this large-scale distribution network, Raymer and defendant plainly knew that the MDMA would be resold without warning or accurate explanation to unknown third parties. That is sufficient evidence for a jury to find that Raymer and his coconspirators, including defendant, introduced misbranded drugs into interstate commerce with the requisite intent to mislead and defraud those who would purchase on resale. *See United States v. Bradshaw,* 840 F.2d 871, 874 n. 4 (11th Cir.1988). That defendants and some of their customers may have known the true nature of MDMA does not matter; intent may be inferred from their almost certain knowledge that the misbranded MDMA would pass to unknown third parties. *See United States v. Goodwin,* 455 F.2d 710, 713 (10th Cir.) (under 18 U.S.C. § 473, government agent and defendant may know that notes are counterfeit, where government proves that notes were to be used as genuine), *cert. denied,* 409 U.S. 859, 93 S.Ct. 146, 34 L.Ed.2d 105 (1972). Sufficient evidence indicates that defendant Mitcheltree introduced misbranded MDMA into interstate commerce while acting with intent to mislead or defraud natural persons as required by 21 U.S.C. § 333(a)(2).

The government's expert pharmacologist testified that "MDMA has pharmacological

---

**14.** Volk testified that in July 1985, defendant approached him and his roommate at Confetti's nightclub with the suggestion that they try some ecstasy she had obtained from Bobby Lewis. Rec. supp. vol. V at 423, 425.

Volk: She asked if we would try this new drug out called ecstasy. We had not and she had tried to tell us that it was all natural, it would make you feel great, so on and so forth.

. . . .

The only thing she told me at this time is that it would make you feel great and that it was all natural. The ingredients were all natural.

Prosecutor: What did you understand that to mean.

Volk: I didn't consider it to be a synthetic makeup of anything. It was like a lot of herbs and things and would give you a chemical reaction in your body that would make you feel different.

*Id.* at 424.

properties which it shares in common with two classes of controlled substances." Rec. supp. vol. VI at 878–79. Like methamphetamine and cocaine, it is a central nervous system stimulant. *Id.* In low doses, it is an hallucinogenic substance like marijuana; in higher doses, it produces visual hallucinations like LSD. *Id.* It has addictive properties. Even when MDMA was not scheduled as a controlled substance, its lawful manufacture would have required FDA registration. *Id.* at 873. As a drug, MDMA's lawful use in humans would have required FDA approval involving factors such as safety and efficacy. *Id.* at 874. The government pharmacologist testified that "the FDA did not nor does it now permit the manufacture or human use or importation of MDMA." *Id.* at 877. MDMA is not manufactured by any legitimate pharmaceutical house; rather it is manufactured clandestinely, solely for those "who are making it for others to abuse." *Id.* at 873.

### A.

■ The government may premise criminal liability under § 333(a)(2) based upon an intent to mislead or defraud not only natural persons, but also government agencies if there is evidence that a defendant consciously sought to mislead drug regulatory authorities such as the FDA or a similar governmental agency. The case law from this circuit recognizes such a result. In *United States v. Industrial Laboratories Co.,* 456 F.2d 908 (10th Cir. 1972), the defendant company and its chief chemist were convicted of introducing an adulterated drug into interstate commerce with intent to mislead and defraud. The defendants had performed testing for a Denver veterinary lab, which then consigned the tested product to a veterinary products firm in Canada. The Canadian firm (consignee) requested defendants to perform more tests in compliance with new standards set by the Canadian government. After agreeing with the consignor to perform the tests, defendants did not and represented otherwise. Two lots of drugs were adulterated.

We held that the district court's instructions failed to state clearly that an element of the offense under § 333(a)(2) was an intent to mislead or defraud. *Id.* at 910–11. In so holding, we stated:

> The jury should have been further directed that it was necessary for it to find that defendant knew that several tests had not been made, that [the individual defendant] intentionally misrepresented that they had, and that he did so for the purpose of misleading and defrauding the consignee and the Canadian authorities that such several tests had been performed.

*Id.* at 910. Thus, the specific intent requirement of the statute could be satisfied by a showing that defendants intended to mislead or defraud the Canadian authorities and the Canadian consignee. Although the jury instruction was phrased in the conjunctive, "misleading and defrauding the consignee *and* the Canadian authorities," *id.* (emphasis added), it does not appear that the proof would admit one without the other.

Thereafter, in *United States v. Cattle King Packing Co.,* 793 F.2d 232 (10th Cir.), *cert. denied,* 479 U.S. 985, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986), we considered the sufficiency of the evidence on a conspiracy count and a substantive count involving, among other things, returning rejected meat to the packing company while bypassing the required federal meat inspection. We held that sufficient evidence supported the convictions. *Id.* at 237. Defendants consciously misled government meat inspectors and a government veterinarian. *Id.* at 237. In discussing a substantive count in which the meat was ultimately discarded, we found sufficient evidence that defendants "directed the illegal circumvention of federal inspection when the Western Grocers' shipment was returned" to the plant. *Id.* at 237–38. We also noted the correspondence between the Federal Meat Inspection Act provision at issue, 21 U.S.C. § 676(a), and the provision of the Food, Drug, and Cosmetic Act (FDCA) at issue in this case, 21 U.S.C. § 333(a)(2). *Id.* at 240.

**1348**

In *Cattle King Packing,* one of the parties defrauded was the government agency charged with federal meat inspection, acting through federal meat inspectors and a government veterinarian. *Cattle King Packing* is consistent with *Industrial Laboratories* which recognized that the Canadian authorities involved in setting standards for drugs could be misled or defrauded. Although we have not squarely addressed the issue, the government urges us to follow and apply the Eleventh Circuit's decision in *Bradshaw,* which held that an intent to mislead or defraud under § 333(a)(2) may extend to government enforcement agencies. *Bradshaw,* 840 F.2d at 874–75. Defendant, on the other hand, suggests that we follow the comments in *United States v. Haga,* 821 F.2d 1036 (5th Cir.1987), *cert. denied,* 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988), which cast some doubt as to whether an intent to mislead or defraud under § 333(a)(2) may extend to government regulatory systems.

We think it important to discuss what we perceive as the operative facts in *Bradshaw.* There, defendant *"admitted* that he operated an illegal wholesale drug business." *Bradshaw,* 840 F.2d at 871 (emphasis added). He sold steroids, without prescriptions, for body building, a use not approved by the FDA. This constitutes misbranding. *Id.* at 871 n. 2. He went to great lengths to avoid detection, including mislabeling the packages containing the steroids as vitamins and " 'Herbalife products.' " *Id.* at 873. He also made affirmative misrepresentations and omissions to the Florida state drug authorities while attempting to obtain a valid Florida drug wholesalers permit. *Bradshaw,* 840 F.2d at 873. The government claimed that the defendant "had defrauded or misled both the FDA and the Florida enforcement agencies." *Id.* The jury was instructed on either theory. In considering defendant's conduct, the appellate court held that an intent to defraud under § 333(a)(2) could extend to federal and state drug enforce-

ment authorities, *i.e.,* the FDA and the Florida state drug authorities. *See id.* at 873, 875 n. 9.

> The general scheme of the Act and its legislative history indicate that the overriding congressional purpose was consumer protection—the protection of the public against any misbranded or adulterated food, drug, device, or cosmetic. When Bradshaw misled governmental agencies, thereby frustrating their efforts to protect the public, he indirectly misled and defrauded the public.

*Id.* at 874. State drug enforcement agencies, like the Florida authorities who issue permits and licenses, also are involved in consumer protection and work closely with their federal counterpart, the FDA. *Id.* at 875 n. 9. Accordingly, state drug agencies also may be misled or defrauded under § 333(a)(2). *Id.* *Bradshaw* seems to apply when there is proof of a conscious effort to mislead or defraud the FDA or a state counterpart involved in consumer-oriented drug regulation. In *Bradshaw,* such proof involved evidence of conscious misbranding for the purpose of deliberately evading the FDA's restrictions concerning steroids and misleading the Florida state drug authorities issuing drug wholesaler permits.

■ Defendant relies heavily upon *United States v. Haga,* 821 F.2d 1036 (5th Cir.1987), a case involving a prosecution under 18 U.S.C. § 371 (conspiracy statute) and 21 U.S.C. § 333. *Haga* noted that "the cases construing section 333[ (a)(2) ] have ordinarily been based on a seller's intent to defraud or mislead *purchasers,* and not on the theory that a defendant has defrauded or misled the government by evading or violating its regulatory systems." *Id.* at 1041 (footnote omitted).[15] We do not read this observation as foreclosing a prosecution on the theory that during the course of misbranding drugs the FDA or its state counterpart has been misled or defrauded by a misrepresentation or omission.

---

**15.** The *Haga* court relied on *United States v. Industrial Laboratories Co.,* 456 F.2d 908 (10th Cir.1972), as supporting this proposition. *Haga,* 821 F.2d at 1041 n. 9. As discussed above,

*Industrial Laboratories* indicated that the jury should be instructed that the intent to defraud could run to the Canadian authorities involved in drug regulation.

Moreover, according to the Fifth Circuit, *Haga* is a variance case; the indictment charged a "commit any offense" conspiracy rather than the alternative "defraud the United States" conspiracy under § 371. *Haga*, 821 F.2d at 1043. The district court judge, however, found that defendant was " 'guilty of the felony offense of conspiracy to defraud an agency of the United States, the FDA....' " *Haga*, 821 F.2d at 1044–45, 1043 n. 14. A fatal variance existed between the indictment as construed by the appellate court and the proof at trial as reflected in the district court's findings. *Id.* at 1045; *United States v. Allred*, 867 F.2d 856, 867 (5th Cir.1989). *But see United States v. Smith*, 891 F.2d 703, 711–13 (9th Cir.1989) (rejecting *Haga*'s construction of § 371), *amended*, 906 F.2d 385, *cert. denied*, —— U.S. ——, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990).

■ In rejecting the government's theory of the case, however, the court in *Haga* expressed reservations concerning the validity of a "commit any offense" conspiracy, 18 U.S.C. § 371, which relies upon "distributing prescription drugs in knowing violation of federal and state regulatory systems and rules," 21 U.S.C. § 333(a)(2), for the offense. *Haga*, 821 F.2d at 1044 (emphasis omitted) & 1044–45 n. 17. According to the court, such a theory would

> as a practical matter have the effect of rendering the "defraud and mislead" language of § 333[ (a)(2) ] mere surplusage in the prosecution of any defendant charged with a conscious (and not publicly proclaimed) violation of section 331—only inadvertent (or publicly announced) violations of section 331 would be misdemeanors, because all conscious (and not publicly confessed) violations would necessarily involve a deliberate evasion of established regulatory systems.

*Id.* We think that this criticism is tempered somewhat by the specific intent required in a § 333(a)(2) prosecution. And if the government proceeds on this theory, there must be a demonstrated link between the § 331 violation and an intent to mislead or defraud an *identifiable* drug regulatory agency involved in consumer protection.

*See Cattle King Packing*, 793 F.2d at 237–38; *Industrial Laboratories*, 456 F.2d at 910–11. Distributing drugs in knowing violation of federal and state regulatory systems and rules is too general.

We believe that the specific intent requirement in § 333(a)(2) requires not only proof of misbranding under § 331, but also proof of an intent to mislead or defraud *which is connected to the misbranding violation under § 331. See Industrial Laboratories*, 456 F.2d at 910–11; *United States v. Hiland*, 909 F.2d 1114, 1128 (8th Cir.1990). *See also United States v. Agnew*, 931 F.2d 1397, 1408–09 (10th Cir.1991) (felony conviction under Federal Meat Inspection Act, 21 U.S.C. § 676(a) for transporting adulterated meat). Because "knowledge of the essential nature of the alleged fraud is a component of the intent to defraud," a defendant cannot act with intent to mislead or defraud under § 333(a)(2) without some knowledge of the misbranding. *Hiland*, 909 F.2d at 1128; *Industrial Laboratories*, 456 F.2d at 910 (jury should have been instructed that "defendant *knew* that several tests had not been made").

■ These limitations are consistent with the Supreme Court's prior interpretation of the Act. In construing the predecessor of the 1938 Act, the Supreme Court observed that it

> was passed by Congress, under its authority to exclude from interstate commerce impure and adulterated food and drugs and to prevent the facilities of such commerce to be used to enable such articles to be transported throughout the country from their place of manufacture to the people who consume and use them, and it is in the light of the purpose and of the power exerted in its passage that this act must be considered and construed.

*McDermott v. Wisconsin*, 228 U.S. 115, 128, 33 S.Ct. 431, 433, 57 L.Ed. 754 (1913) (construing Food and Drugs Act of 1906, 34 Stat. 768). *See also United States v. Lexington Mill Co.*, 232 U.S. 399, 409, 34 S.Ct. 337, 340, 58 L.Ed. 658 (1914) (identifying the primary purpose of misbranding

and adulteration provisions concerning food as consumer protection). The current Act protects the consuming public by allowing the government to regulate the conditions under which drugs are manufactured and distributed and it requires those responsible to comply with its provisions. *United States v. Park*, 421 U.S. 658, 673, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975). Misdemeanor criminal responsibility does not require "consciousness of wrongdoing." 21 U.S.C. § 333(a); *United States v. Dotterweich*, 320 U.S. 277, 284, 64 S.Ct. 134, 138, 88 L.Ed. 48 (1943) ("The offense is committed ... by all who do have such a responsible share in the furtherance of the transaction which the statute outlaws, namely, to put into the stream of interstate commerce adulterated or misbranded drugs."); *United States v. Abbott Laboratories*, 505 F.2d 565, 573 (4th Cir.1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 671 (1975). On the other hand, felony criminal responsibility requires a knowing violation with the specific intent "to defraud or mislead," 21 U.S.C. § 333(a)(2); that this may be proved with facts indicating knowledge of the misbranding activity and a concomitant intent to defraud or mislead the FDA or its state counterpart seems consistent with the statute's purpose as interpreted by the courts.

B.

The government contends that sufficient circumstantial evidence suggests that defendant conspired to violate 21 U.S.C. § 331(a), (k) and (p) with the intent to mislead law enforcement agencies.[16] Appellee's Brief (No. 89–6362) at 37–39. In particular, the government maintains that defendant and Raymer misbranded the MDMA with the intent to mislead and defraud local police departments in Dallas, Plano and Oklahoma City. Timely objection was made to instructing the jury on this theory. Rec. supp. vol. IX at 1360–61. The prosecutor told the jury, over an objection, that defendant Raymer "was misleading and defrauding while holding himself out as someone cooperating with law enforcement, not stopping his activity but continuing in an even more covert manner than flying through these commercial airlines." *Id.* at 1427. At the trial's conclusion, the trial judge expressed his view that the government's theory was somewhat far afield. *Id.* at 1362.

Relying upon *Bradshaw*, however, the district court determined that a state or local agency could be defrauded under

---

**16.** The trial testimony indicates that defendant was an integral part of Raymer's MDMA distribution network and may have assisted him in concealment of his activities. Raymer initially traveled via commercial airliner from Texas to Oklahoma and concealed the MDMA on his person. In October 1985, he was arrested in an undercover buy operation at Dallas Love Field, en route to Oklahoma City. Rec. supp. vol. IV at 232, 244. The Dallas police obtained search warrants and found 2,450 unlabeled MDMA tablets in an airport locker and in Raymer's carry on luggage. *Id.* at 232. After his arrest, Raymer purchased a new vehicle and began driving from Dallas to Oklahoma City because it entailed less chance of being caught with the contraband. Rec. supp. vol. V at 450. While in Oklahoma City, he stayed with Volk and defendant and distributed MDMA. *Id.* By January 1986, Raymer, Volk and defendant were packaging MDMA for resale. *Id.* at 456.

In February 1986, defendant relied upon an informant and, using an alias, sold an Oklahoma City undercover narcotics officer forty-eight tablets of MDMA for $784. Rec. supp. vol. V at 571–78. In June 1986, Raymer was arrested by the Plano police department for his drug activities. He agreed to cooperate with the Plano authorities for more lenient treatment. Rec. supp. vol. III at 78. Defendant and Volk had to quit the MDMA business because Raymer was no longer making trips to Oklahoma City. *Id.* supp. vol. IV at 469. According to Volk, a few months later Raymer contacted defendant offering to send MDMA through the mail. Volk talked with Raymer about this, and Raymer explained that express U.S. mail was preferable because "the law states you need a court order to get into the U.S. mail," *id.* at 470, and a private parcel service "can open it," *id.* at 471. For two or three weeks, MDMA tablets were sent to defendant and Volk through the mail. *Id.* Thus, during September–October 1986, road trips and the mail facilitated the distribution.

The distribution of MDMA frequently occurred in public places. Raymer confessed to the FBI that he used pagers to make arrangements with MDMA suppliers. Later, he would retrieve the drugs which had been left for him from a designated place such a mens' restroom at McDonalds or Burger King. Rec. supp. vol. III at 80. Defendant would make individual sales from the ladies' restroom at Confetti's nightclub.

§ 333(a)(2), while acknowledging that it was "a very close legal issue." Rec. supp. vol. X at 5. *See also id.* ("Let me just say that I have real concern as to whether or not the Food, Drug and Cosmetic Act was intended to apply to schemes to defraud the Plano Police Department."). When sentencing codefendant Raymer, the district court recognized that the misbranding counts were

> frankly, ... a nontraditional, perhaps innovative indictment by the government on conduct that was not squarely labeled as illegal by Congress and not dealt with directly by Congress until the passage of the Controlled Substance Analogue Act [in October 1986].
>
> . . . .
>
> Almost all the cases under the misbranding theory deal with situations that are completely different than the situation we have here. I have struggled with those counts since the outset of the case, indeed, to the point that I considered dismissing them at the conclusion of the case and even up until today.

Rec. supp. vol. X at 34–35. We share the district court's reservations about counts one and four.

■ After a thorough review of this record, no rational trier of fact could conclude beyond a reasonable doubt that the defendants (Mitcheltree and Raymer) acted to mislead or defraud a government agency responsible for drug safety and efficacy with the objective of consumer protection. Moreover, not a scintilla of evidence links the defendants' misbranding activities with a specific intent, 21 U.S.C. § 333(a)(2), to violate or defeat agency enforcement of the actual federal drug regulatory provisions alleged in counts one and four of the indictment, *i.e.,* 21 U.S.C. §§ 331(a); 352(b), (c), (e), (j) & (*o*); 331(k); 331(p) & 360. *See Hiland,* 909 F.2d at 1128. This conclusion is even more apparent considering the type of proof (involving fraudulent conduct) which courts have found sufficient to uphold § 333(a)(2) convictions. *See, e.g., United States v. Jamieson–McKames Pharm.,* 651 F.2d 532, 543–50 (8th Cir.1981) (counterfeit drug operation), *cert. denied,*

455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982); *United States v. Barnett,* 587 F.2d 252, 254 n. 1, 257 (5th Cir.1979) (adulterated cottonseed meal), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2031, 60 L.Ed.2d 396 (1979).

■ We are unwilling to blur the distinction between the misdemeanor and felony provisions of § 333(a). The felony provision requires knowledge of the misbranding and proof of specific intent to mislead or defraud connected to the misbranding violation. The government's evidence suggests that local police departments were investigating the distribution of MDMA (as well as unlawful drugs) when the defendants were misbranding MDMA. But merely because the activities of the defendants and the police may have been contemporaneous does not constitute sufficient proof that the defendants knowingly misbranded with the specific intent to mislead or defraud those police departments. For us to so hold would be to adopt a standard which would be inconsistent with the misdemeanor provision of the statute, 21 U.S.C. § 333(a)(1). *See Haga,* 821 F.2d at 1044–45 n. 17.

In the alternative, nothing in the record indicates that the local police departments, at the times alleged in counts one and four, were accomplishing anything other than routine controlled substance investigations. No evidence even remotely suggests that the local investigation encompassed misbranded drugs. Indeed, sometime after early 1989 (when the misbranding had ceased), a Department of Justice official "provided significant in-depth consultations on the nature and framework of the indictments including a recommendation that the mis-branding provisions of Title 21 be examined for applicability to the facts in the instant case." Affidavit of R. Wintory, supp. vol. XII, doc. 167 at 5, ¶ 12(c). Resort to this theory was necessary, at least in part, because MDMA was not scheduled properly at the federal level until October 1986.

■ In the end it is not necessarily the novelty of the government's theory, but rather the lack of evidence to support it, which requires reversal of the defendant's

convictions on the misbranding counts. We recognize that a defendant may knowingly misbrand with an intent to mislead or defraud a government authority that, for example, sets drug standards, *Industrial Laboratories*, 456 F.2d at 909, inspects drugs, *cf. Cattle King Packing*, 793 F.2d at 237, regulates the use of prescription drugs, *Bradshaw*, 840 F.2d at 872; *United States v. Cerrito*, 413 F.2d 1270, 1272 (7th Cir.1969), *cert. denied*, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970), or issues permits to drug wholesalers, *Bradshaw*, 840 F.2d at 873. What is missing in this case is (1) any conscious involvement by the defendant with a government agency involved in consumer protection which performs any of the above or similar functions, and (2) any link between conscious misbranding activity and a specific intent to mislead or defraud such an agency.

It is not enough to say, as does the government, that the success of the venture to distribute MDMA depended upon misbranding without proving that the defendants misbranded with the intent to mislead or defraud a government agency involved in consumer protection of some sort. Contrary to the government's position, covert criminal activity involving drugs is not synonymous with misbranding with an intent to mislead or defraud. Because the jury was instructed on a theory for which insufficient evidence exists and we cannot "confidently determine that the jury relied on the theory validly supported by the evidence," we must reverse the convictions on counts one and four and also remand for a new trial.[17] *United States v. Larranaga*, 787 F.2d 489, 497–98 (10th Cir.1986). *See also United States v. Irwin*, 654 F.2d 671, 679–80, 684 (10th Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982); *United States v. Radetsky*, 535 F.2d 556, 573 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *United States v. Dota*, 482 F.2d 1005, 1006 (10th Cir.), *cert. denied*, 414 U.S. 1071, 94 S.Ct. 583, 38 L.Ed.2d 477 (1973). *But see United States v. Griffin*, 913 F.2d 337, 357, 361–65 (7th Cir.1990), *cert. granted*, ——— U.S. ———, 111 S.Ct. 951, 112 L.Ed.2d 1039 (1991).

REVERSED and REMANDED.

---

**17.** In *Industrial Laboratories*, we relied upon 28 U.S.C. § 2106 and reduced the defective felony convictions under § 333(a)(2) to misdemeanors under § 333(a)(1). *Industrial Laboratories*, 456 F.2d at 911–912. *See also Tinder v. United States*, 345 U.S. 565, 570, 73 S.Ct. 911, 913, 97 L.Ed. 1250 (1953). We cited with approval *Allison v. United States*, 409 F.2d 445 (D.C.Cir.1969) which discussed the limited circumstances in which the authority under § 2106 may be exercised:

It must be clear (1) that the evidence adduced at trial fails to support one or more elements of the crime which appellant was convicted, (2) that such evidence sufficiently sustains all the elements of another offense, (3) that the latter is a lesser included offense of the former, and (4) that no undue prejudice will result to the accused.

*Allison*, 409 F.2d at 450; *see also United States v. Boissoneault*, 926 F.2d 230, 235 (2d Cir.1991). We note that no lesser included offense instructions were given in this case, unlike *Boissoneault*, 926 F.2d at 235; *United States v. Figueroa*, 666 F.2d 1375, 1377 (11th Cir.1982); *Industrial Laboratories*, 456 F.2d at 909–10 n. 3; *DeMarrias v. United States*, 453 F.2d 211, 215 (8th Cir.1972); and *Allison*, 409 F.2d at 452; *but see United States v. Cobb*, 558 F.2d 486, 489 n. 5 (8th Cir.1977), nor have the parties made any concessions on this issue, *see, e.g., United States v. Swiderski*, 548 F.2d 445, 452 (2d Cir.1977); *Industrial Laboratories*, 456 F.2d at 911–12; let alone addressed it. In these circumstances, we decline to order the district court to impose misdemeanor convictions on counts one and four.