**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James A. BRADSHAW, Defendant–Appellant.**

No. 86–6019.

United States Court of Appeals, Eleventh Circuit.

March 25, 1988.

Frank Courbois, Charles F. Cox, Oklahoma City, Okl., for defendant-appellant.

Gerald C. Kell, Dept. of Justice, Washington, D.C. (Leon B. Kellner, U.S. Atty., Miami, Fla., Eugene M. Thirolf, Jr., Dept. of Justice, Washington, D.C., on the brief), for plaintiff-appellee.

Before TJOFLAT and ANDERSON, Circuit Judges, and ROETTGER *, District Judge.

---

\* Honorable Norman C. Roettger, Jr., U.S. District Judge for the Southern District of Florida, sitting by designation.

1. As commonly used, the term "steroids" denotes a large class of prescription drugs, some of which fit the technical definition of steroids and some of which do not. Although apparently not all of the drugs Bradshaw sold would fit the definition of steroids, for the sake of convenience we use the term "steroids" throughout this opinion to refer to all of those drugs.

ANDERSON, Circuit Judge:

The appellant, James Bradshaw, appeals his conviction for violating the Federal Food, Drug, and Cosmetic Act (the "FDC Act" or the "Act"). 21 U.S.C. §§ 301–392. The various acts that constitute criminal violations of the FDC Act are set forth in 21 U.S.C. § 331. All of these violations are misdemeanors regardless of the violator's intent. 21 U.S.C. § 333(a). A violation of the Act becomes a felony if it is a second offense or if it is committed with "intent to defraud or mislead." 21 U.S.C. § 333(b). The principal issue on this appeal is whether the intent requirement of § 333(b) encompasses an intent to defraud or mislead a government enforcement agency. Because we find that it does, we affirm the conviction of the appellant.

Bradshaw admitted that he operated an illegal wholesale drug business. More specifically, Bradshaw sold drugs widely known as "steroids" [1] to customers without prescriptions.[2] Bradshaw's customers were mostly athletes who took steroids to increase muscle mass and thereby improve athletic performance. Although effective for those purposes, the drugs also have many harmful side effects. The Food and Drug Administration ("FDA") has approved the use of steroids for certain medical purposes, but not for the purposes of increasing muscle mass and improving athletic performance.

The FDA first became aware of Bradshaw's business in late 1982. Acting on information from an FDA undercover investigation, Oklahoma authorities arrested Bradshaw in May, 1983. In the course of that arrest, a search of Bradshaw's apartment uncovered over 100 containers of steroids. Bradshaw pled guilty to one

2. 21 U.S.C. § 331 provides as follows:
The following acts and the causing thereof are prohibited:
(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded....
Pursuant to 21 U.S.C. § 353, a prescription drug dispensed without a prescription is deemed misbranded. Thus, selling prescription drugs without a prescription is a violation of the Act.

state charge growing out of that incident and served no time in prison.

Undeterred by his first brush with the law, Bradshaw continued his wholesale steroid business until the search of his apartment in May, 1985 which led to the charges in this case. During this period, Bradshaw took various actions to avoid detection. He moved from state to state frequently. He used mail drops rather than his home address when mailing drugs to customers. He repeatedly used false names. He mislabeled his packages as vitamins and "Herbalife products." He hired surrogates to pick up and deliver the packages to carriers. He discussed methods of avoiding detection with his customers.

Just prior to the time of the search, Bradshaw was operating in Florida. In an attempt to obtain a Florida drug wholesaler's permit in the spring of 1984, Bradshaw made affirmative misrepresentations to Florida state drug authorities. He led the authorities to believe that he was an established drug wholesaler in Alabama, and the Florida authorities issued him a permit on that basis. Bradshaw did have a valid Alabama license at the time of his initial Florida application. However, the Alabama license expired during the pendency of the Florida application, and Bradshaw never informed the Florida authorities. Moreover, Bradshaw also led the Florida authorities to believe that he would keep his business in Alabama and only have agents in Florida. Instead, Bradshaw moved his entire operation to Florida. Because Bradshaw never notified the Florida authorities of the identity of his agents and never had a facility inspected, the Florida permit was never valid.

In the particular transactions at issue here, Bradshaw sold steroids through the mail to Jon Barton Shields and Susan Perkins. Both Shields and Perkins testified that they bought the steroids for personal use and resale. Both Shields and Perkins also testified that although Bradshaw nev-

er told them of the side effects of the drugs, they never felt that Bradshaw defrauded or misled them. They were willing buyers, and Bradshaw provided them with exactly what they ordered.

Therein lies the dispute in this case. Bradshaw admits that the transactions took place and that they constituted misdemeanors under the Act. He argues, however, that because Shields and Perkins bought the drugs willingly, he did not intend to defraud or mislead anyone. Therefore, he contends that he cannot be convicted of the felony.[3]

Recognizing the problem that Bradshaw's argument presented, the government offered an alternative theory of the case. It claimed that Bradshaw had defrauded or misled both the FDA and the Florida enforcement authorities. Bradshaw filed a motion *in limine* to prevent the government from pursuing its alternative theory before the jury, but the district court denied that motion.

At trial, the judge instructed the jury that it could consider the government's theory. During the deliberations, the jury sent back a note asking the judge to clarify what entities could be the object of an intent to defraud or mislead. Over Bradshaw's objection, the court further instructed the jury as follows:

> If you conclude from the evidence as a whole that there was an intent to defraud or mislead any one of the entities, that is, the natural persons, State Agency, or Federal Government Agency, ... then you may consider that the necessary intent has been proved.

Record on Appeal, vol. 6 at 521. The jury then returned a general verdict convicting Bradshaw of 21 of the 23 counts against him.

The instruction quoted above permitted the jury to return a verdict on any of three grounds: (1) that Bradshaw intended to defraud natural persons;[4] (2) that Bradshaw intended to defraud a state law en-

---

**3.** Bradshaw apparently had no prior federal convictions under the FDC Act. For that reason, he could not be charged under the second offense prong of the felony provision.

**4.** Bradshaw argues that the government did not offer sufficient evidence to prove that he intended to defraud or mislead either John Barton Shields or Susan Perkins, the immediate purchasers in the transactions at issue here. We

forcement agency; or (3) that Bradshaw intended to defraud a federal law enforcement agency. The government concedes that each of these grounds must be sufficient as a matter of law in order for us to uphold Bradshaw's conviction. The government also concedes that the submission of its theory was not harmless if it was error. Bradshaw argues that the trial judge erred in allowing the jury to consider an alleged intent to defraud state and federal enforcement authorities.

We must determine whether the trial judge properly submitted the government's theory to the jury. Bradshaw urges us to construe 21 U.S.C. § 333(b) strictly to limit the felony penalty to situations in which the conduct defrauds or misleads the ultimate consumer. In considering Bradshaw's argument, we are mindful that "[t]he starting point of statutory construction is the plain language of the statute itself." *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978).

We see no indication in the language of the statute or its legislative history that Congress meant to limit the felony penalty to conduct intended to defraud the ultimate consumer to the exclusion of the government enforcement agencies. To the contrary, the structure of the statutory scheme, the purpose of the statute, and the case law persuade us that Congress meant to encompass conduct intended to defraud government enforcement agencies.

As noted at the outset, 21 U.S.C. § 331 lists the acts which constitute criminal violations of the Act. Section 333(a) provides that anyone who violates a provision of § 331 commits a misdemeanor. Section 333(b) provides that "[n]otwithstanding the provisions of subsection (a) of this section, if any person commits ... such a violation [i.e., a violation of § 331] with intent to defraud or mislead ...," he commits a felony.

Several of the acts § 331 prohibits concern only the government. For example, § 331(p) prohibits the failure to register with the FDA. Other examples include § 331(e) (failure to permit FDA access to records and failure to make reports to the FDA) and § 331(f) (refusal to permit FDA inspection). After reading these sections with § 333, it is clear that the FDA is the entity most likely to be defrauded under these provisions. Thus, we conclude that Congress intended the "intent to defraud or mislead" language of § 333(b) to extend to the FDA.[5]

The purpose of the statute also supports our conclusion. The general scheme of the Act and its legislative history indicate that the overriding congressional purpose was consumer protection—the protection of the public against any misbranded or adulterated food, drug, device, or cosmetic. When Bradshaw misled the governmental agencies, thereby frustrating their efforts to protect the public, he indirectly misled and defrauded the public. Thus, Bradshaw's actions fell squarely within the congressional purpose. Bradshaw's arguments that the Act's goal of consumer protection somehow limits the felony penalty

find that the judge's reference to "the natural persons" was broad enough to encompass the unknown third persons to whom Perkins and Shields planned to resell the drugs. *See Riggs v. United States*, 280 F.2d 750 (5th Cir.1960) (intent to defraud in statute prohibiting passing of counterfeit currency could extend to unknown future transferees even when the original transferees knew the currency was counterfeit). *Riggs* was decided prior to the close of business on September 30, 1981, and is binding precedent under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981). Because the evidence clearly showed that Bradshaw knew that Perkins and Shields bought for the purpose of resale, we have no trouble in ruling that the government offered sufficient evidence for the jury to find that Bradshaw intended to defraud those unknown third persons to whom Perkins and Shields would resell the drugs.

5. We also note the Tenth Circuit's decision in *United States v. Cattle King Packing Co.*, 793 F.2d 232 (10th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986). Although the defendants did not raise the issue, the court affirmed their felony convictions under similar provisions of the Federal Meat Inspection Act. The defendants were meat packers. Among other things, they were convicted of failing to have meat which had been returned as unfit inspected before reshipping it. In at least one instance, the meat was not reshipped. 793 F.2d at 237–38. In that case, it is difficult to see who was defrauded other than the government.

to conduct intended to defraud the consumer are unpersuasive. Our result is entirely consistent with that goal.

Finally, although the particular provision at issue here has not been previously interpreted, case law interpreting similar provisions in other statutes is much the same as our interpretation of the FDC Act. For example, in interpreting a similar provision in a counterfeit statute, our predecessor court noted that the statute "uses the comprehensive term 'with intent to defraud' for the very purpose of making it immaterial whether the offender intended to defraud the government or some particular individual." *Bachrack v. United States*, 75 F.2d 824, 824–25 (5th Cir.1935). We believe that had Congress intended to limit the intent requirement to an intent to defraud consumers, it would have plainly said so.[6]

Courts have repeatedly interpreted analogous provisions to include entities other than those one would normally expect to be the parties defrauded. *Barnett v. United States*, 384 F.2d 848, 854–55 (5th Cir. 1967) (intent to defraud in statute prohibiting alteration of currency extended to coin collectors as well as the government); *Riggs v. United States*, 280 F.2d 750 (5th Cir.1960) (intent to defraud in statute prohibiting passing of counterfeit currency ex-tended to unknown future transferees and the government as well as the original person to whom the note was passed); *United States v. Rabinowitz*, 176 F.2d 732 (2d Cir.1949) (intent to defraud in statute prohibiting passing and possessing altered postage stamps extended to private stamp collectors as well as the government), *rev'd on other grounds*, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); *Friedman v. United States*, 5 F.2d 671 (6th Cir.1925) (intent to defraud in statute prohibiting passing of altered liberty bonds extended to unknown future transferees as well as the original transferee).[7] Like the courts in these cases, we believe the drafters of the Act left it flexible enough to cover unforeseen situations.[8] Moreover, courts had already decided *Bachrack, supra*, and *Friedman, supra*, when Congress wrote § 333(b) in 1938, further strengthening our interpretation.[9]

Bradshaw's other arguments are without merit and warrant no discussion. For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

6. Appellant's brief points to no legislative history manifesting any such intent on the part of Congress.

7. *But see United States v. Grissom*, 645 F.2d 461 (5th Cir. Unit A 1981) (intent *to* defraud in statute prohibiting unauthorized disposal of FHA–mortgaged property did *not* extend to sharecropper's landlord as well as government). Because *Grissom* was decided on May 20, 1981, it is binding precedent under *Bonner, supra*, footnote 4. *Grissom* does not persuade us because it seems limited to its peculiar facts and because it implicates certain federalism concerns not present here.

8. We do not think the recent case of *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), affects the analysis in this case. *McNally* rejected a line of decisions in the several courts of appeals holding that the mail fraud statute protects against schemes to defraud citizens of their intangible rights to honest and impartial government. In *McNally*, the Supreme Court held that the "scheme or artifice to defraud" language of the mail fraud statute referred only to deprivations of money or proper-ty, and not to the intangible right of the citizenry to good government. Unlike the mail fraud statute at issue in *McNally*, the statute involved in the instant case is clearly *not* focused on protecting money or property interests. Rather, the instant statutory scheme is designed to protect the public against any misbranded or adulterated food, drug, device, or cosmetic. *See McNally*, —— U.S. ——, 107 S.Ct. at 2881 n. 8.

9. Having found that the intent requirement can extend to the FDA, we have little difficulty in finding that it may extend to state drug enforcement authorities as well. The state enforcement authorities work closely with federal authorities in the common goal of protecting the consumer. We do not believe that Congress could have intended to include the FDA and exclude the state drug enforcement authorities. At a minimum, we believe that Congress would have made such an odd intention explicit.

By so finding, we do not imply any change in the respective jurisdictional spheres of the state and federal agencies. Rather, we decide only that the intent requirement in § 333(b) may extend to a state enforcement agency as well as a federal agency.