8 F.3d 33
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff/Appellee,
v.
Lawrence E. WOOD, Defendant/Appellant.
UNITED STATES of America, Plaintiff/Appellee,
v.
Daniel DUCHAINE, Defendant/Appellant.
 Nos. 92-50512, 92-50514.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 12, 1993.
Decided Oct. 21, 1993.
 
 Before: GIBSON,* HALL, and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Wood and Duchaine appeal their convictions and sentences for various violations of 18 U.S.C. §§ 2, 371 and 21 U.S.C. § 331. We affirm.
 
 I. BACKGROUND
 
 3
 In 1990, the Food and Drug Administration (FDA) was investigating the distribution of Gamma Hydroxybutyrate (GHB) and Clenbuterol in the United States.[1] In the latter part of 1990, the FDA raided a company located in Arizona known as Amino Discounters. Agents discovered that the company had sent a one-pound package to a residence in Thousand Oaks, California, and that two phone calls had been made to the company from a residence in Palm Springs, California. Wood's mother lived at the Palm Springs residence. Agents determined that she was not in the city when the calls were made but that Wood was staying in her house at the time. Agents discovered that Wood was staying in her house at the time. Agents discovered that Wood resided at the Thousand Oaks address to which the package had been sent. Two FDA agents went to Wood's home and entered after allegedly obtaining permission from Wood's housekeeper. Based on their observations, the local sheriff obtained a search warrant. Large quantities of substances, including GHB, were found; Wood was arrested and made incriminating statements.
 
 
 4
 In January 1991, (one month after Wood was arrested), FDA Supervisory Investigator Kim Rice assigned Investigator Dennis Hudson to investigate whether GHB was being distributed in Oregon and Idaho. During this investigation he contacted a fitness center located in Ontario, Oregon and spoke with Kevin Soland. During this conversation, Wood was mentioned as a supplier of GHB; Hudson contends Soland provided the name, while Wood possesses an affidavit from Soland indicating Hudson mentioned Wood's name first. In any event, Hudson contacted Wood and expressed an interest in obtaining GHB. Wood told Hudson he had been raided by the FDA and to call back. On February 15, Hudson received a fax from Wood instructing him to call Wood at home. He did so, and Wood said he would arrange for someone to call him to make the sale. Duchaine called Hudson the next day, and Hudson ordered some GHB. The bottles Hudson received contained GHB, but were not labelled. On February 27, Hudson called Wood and said he was concerned because Duchaine had not labelled the bottles.[2] Wood expressed astonishment at the request, told Hudson he was "being a little naive," and later said he had thrown out 10,000 labels because he was afraid of being apprehended by the FDA. Wood also said that GHB was "all underground now" and that this was "an area that can cause you trouble if you don't act careful [sic]." When Hudson expressed concern over sending cash in the mail without receiving a receipt, Wood said Duchaine did not provide a receipt so as to avoid creating a paper trail. During this conversation, Hudson told Wood he already had six buyers lined up, and Wood assured him that "the word will spread" and he would be able to find additional buyers based on the efficacy of the drugs.
 
 
 5
 In March, Hudson sent Duchaine $230 for the GHB already received, ordered more GHB, requested information about a "German product" he and Duchaine discussed in February, and asked Duchaine to call him. Duchaine did so and took another GHB order from Hudson. He asked Hudson whether he was interested in Clenbuterol, and took Hudson's order for one bottle. Duchaine also told Hudson he and Wood sold only unlabelled products to avoid FDA scrutiny. One week later, Wood received the GHB and Clenbuterol in unmarked bottles. Several more orders and deliveries followed.
 
 
 6
 On May 16, 1991, a warrant was executed for a storage unit Duchaine leased near his home. The locker contained only auto parts and literature about steroids. The manager of the storage facility told the agents Duchaine paid the rent for the locker next to his, which was rented in the name of Duchaine's former girlfriend. One of the agents climbed a ladder, shined a flashlight through the vent at the top of the adjacent locker, looked inside, and saw vials and syringes. The agents obtained and executed a search warrant for that unit and found an unspecified quantity of GHB, Clenbuterol, and related paraphernalia.
 
 
 7
 Wood and Duchaine were charged with one count of conspiring to defraud the United States in violation of 18 U.S.C. § 371 (Count I). Duchaine was charged with five counts of distributing misbranded GHB and Clenbuterol in interstate commerce with the intent to defraud in violation of 21 U.S.C. § 333(a)(2) (Counts II-VI), one count of holding misbranded GHB for sale in violation of 21 U.S.C. §§ 331(k), 333(a)(2) (Count VIII), two counts of holding misbranded Clenbuterol for sale (Counts IX-X), and one count of possessing steroids in violation of 21 U.S.C. § 844(a) (Count XI). Wood was charged with aiding and abetting Duchaine in counts II-VI and VIII, and with one count of holding misbranded GHB for sale (Count VII).
 
 
 8
 Duchaine filed a motion to suppress the evidence found in his ex-girlfriend's locker. The motion was denied. Wood filed a motion to suppress the evidence found in his home, the statements he made after being arrested, and the statements he made to Hudson. The court found the search of Wood's home to be unlawful and suppressed the items found in his home and the statements he made after being arrested,[3] causing the dismissal of Count VII (and the renumbering of all subsequent counts).[4] The court declined to suppress the statements Wood made to Hudson. After a jury trial, Duchaine was found guilty on all counts and Wood was found guilty on all counts except aiding and abetting Duchaine with respect to Count VIII. Both defendants appeal.
 
 II. DISCUSSION
 A. Wood's Statements Made to Hudson
 
 9
 Wood argues Hudson's undercover investigation was the fruit of the illegal search of his home. Wood's theory, which he never had a chance to prove, is that the search of Wood's home unveiled some documents that mentioned Soland's Fitness Center. Hudson then called Soland and mentioned he had been referred by Wood. Soland confirmed Wood's status as a distributor, gave Hudson Wood's phone number, and the undercover officers then targeted Wood. None of this would have happened but for the illegal search, so Wood's statements to Hudson must be suppressed. The district court ruled that a hearing was unnecessary because, even assuming the truth of Wood's allegations, Wood was still a suspect because of the FDA's discovery in Arizona. Consequently, the FDA was free to pursue a new investigative tactic. Wood faults this reasoning by contending he was not a suspect at the time his home was searched. For proof, he offers the following testimony from Agent Williamson:
 
 
 10
 Q. In connection with the investigation that you were making, as I understand it, a company called Amino Discounters in Arizona, you desired, I take it, as I interpret your declaration, sir, to investigate further the matters as they would pertain to Mr. Wood; is that right, sir?
 
 
 11
 A. I don't understand your question.
 
 
 12
 Q. Well, you were interested in GHB so-called; right?
 
 
 13
 A. We were interested in a one pound shipment from Amino Discounters to the Shenandoah address.
 
 
 14
 Q. Of what substance?
 
 
 15
 A. That we didn't know.
 
 
 16
 Q. I see. Well, did you find out what it was?
 
 
 17
 A. That was the purpose of the investigation was to find out what the one pound substance consisted of, whether it was GHB or something else.
 
 
 18
 Q. This was your investigation of GHB, was it not, sir?
 
 
 19
 A. Yes, it's part of a GHB investigation.
 
 
 20
 This exchange does not suggest that Wood was not a suspect. More importantly, however, Wood's status as a suspect (or not) is not of constitutional import. "Absent a showing ... that the government utilized illegally secured information to obtain more than defendants' identities, there is no violation of the Fourth Amendment." United States v. Sand, 541 F.2d 1370, 1376 (9th Cir.1976), cert. denied, 429 U.S. 1103 (1977). Thus, a defendant cannot successfully claim that illegally seized information that causes an investigation to intensify bars all subsequently discovered evidence. Id. Law enforcement knew of Wood's identity and possible involvement in GHB distribution before the illegal search.[5] The statements would not be suppressed even if Wood's theory about how Hudson conducted his investigation were correct, so the district court did not err in refusing to hold a hearing on the matter.
 
 B. Search of the Locker
 
 21
 Duchaine argues the court correctly ruled that the agent's inspection through the locker's vent was an unlawful search within the meaning of the Fourth Amendment, but that the court erred in ruling that the affidavit later used to obtain the warrant stated probable cause because the affidavit failed to establish a factual nexus between Duchaine, the suspected activities, and the storage locker. United States v. Flores, 679 F.2d 173, 175 (9th Cir.1982), cert. denied, 459 U.S. 1148 (1983). The government argues the search was not unlawful; in the alternative, if the search was unlawful, there was probable cause to support the affidavit even if the information found during the initial search was excluded from the affidavit. We do not decide whether the agent's efforts to peer through the locker's vent violated the Constitution because, after reviewing the district court's legal conclusions de novo, United States v. Johns, 891 F.2d 243, 244 (9th Cir.1989), we agree that the affidavit presented sufficient probable cause to support the warrant even if the results of the supposedly unlawful search were not reported. The affidavit reported that Duchaine sold GHB and Clenbuterol, that Duchaine made frequent visits to the locker facility (including at least one occasion when he did so immediately after receiving an order from a confidential informant), that Duchaine made the rental payment for the locker, the locker was registered in the name of a former girlfriend who had been arrested with Duchaine for distributing anabolic steroids, and the only other locker connected to Duchaine did not contain any illegal substances. We believe this sufficient to "enable the magistrate to conclude that it would be reasonable to seek the evidence in the place indicated by the affidavit." United States v. Hendershot, 614 F.2d 648, 654 (9th Cir.1980).
 
 C. Interstate Commerce
 
 22
 Duchaine argues the district court erred in denying his request for special interrogatories concerning the interstate commerce element of Count Eight. Specifically, he sought to require the jury to identify which portion of the drugs it believed had travelled through interstate commerce. Duchaine also argues his Sixth Amendment right to counsel was violated because the district court did not allow his counsel to argue, during closing argument, that some of the GHB in Count Eight had not travelled through interstate commerce. The decision whether to submit special interrogatories is a matter committed to the sound discretion of the trial judge, Cancellier v. Federated Dept. Stores, 672 F.2d 1312, 1317 (9th Cir.), cert. denied, 459 U.S. 859 (1982), and the trial court "has a duty to control final argument and to prevent any improper arguments." United States v. Spillone, 879 F.2d 514, 518 (9th Cir.1989), cert. denied, 498 U.S. 878 (1990). Based on these principles, we affirm the district court.
 
 
 23
 The court did not err in refusing the request for special interrogatories because Duchaine's theory--that the jury could have acquitted him if the government did not prove that all the GHB travelled through interstate commerce--rests on an improper statement of the law. In order to convict Duchaine, the government only had to prove that some of the GHB found in his storage unit went through interstate commerce. Because quantity was not an element of the offense charged, the jury could properly convict Duchaine on Count Eight if only some of the GHB travelled through interstate commerce. Cf. United States v. Sotelo-Rivera, 931 F.2d 1317, 1319 (9th Cir.1991), cert. denied, 112 S.Ct. 1186 (1992). (quantity not relevant to guilt when it is not specified in the statute). The statute's failure to include quantity as an element of the offense makes quantity relevant for sentencing, but not guilt. From this conclusion, it is apparent that Duchaine's Sixth Amendment argument must fail. Duchaine was properly prevented from arguing (incorrectly) that the government must prove that all of the GHB travelled through interstate commerce. The district court did not commit error.
 
 D. Sufficiency of the Evidence
 1. Count I
 
 24
 Count I was based on 18 U.S.C. § 371, which makes it a crime when "two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof...." (emphasis added). Wood and Duchaine were charged with violating the second branch of the disjunctive based on a theory that they interfered with a legitimate government function, which is permitted by a variety of cases. E.g., Dennis v. United States, 384 U.S. 855, 861 (1966). Specifically, the indictment charged that the defendants "agreed with each other to defraud ... the FDA, by interfering with and obstructing the FDA's lawful government function to ensure that prescription drugs are safe and effective...." Wood argues there was insufficient evidence to prove 1) that he knew GHB and Clenbuterol were prescription drugs, and 2) that the government suffered any monetary loss. We reject both contentions.
 
 
 25
 We will not recount the conflicting evidence regarding GHB's and Clenbuterol's status as prescription drugs. Instead, we simply note the evidence did conflict, and, when viewed in the light most favorable to the prosecution, United States v. Everett, 692 F.2d 596, 601 (9th Cir.1982), cert. denied, 460 U.S. 1051 (1983), was sufficient to support the jury's verdict.
 
 
 26
 Wood's contention involving the lack of monetary loss must fail because the case upon which he relies, McNally v. United States, 483 U.S. 350 (1987), did not involve § 371; it involved 18 U.S.C. § 1341, which prohibits mail fraud. Furthermore, Wood's argument has been specifically rejected within the context of § 371. E.g., United States v. Tuohey, 867 F.2d 534, 536-37 (9th Cir.1989) (refusing to apply McNally in this context due to rationale in Dennis ); see also Everett, 692 F.2d at 599 (pre-McNally case stating that "[s]ection 371 does not require that the government actually be harmed"), cert. denied, 460 U.S. 1051 (1983).
 
 2. Counts II-VI
 
 27
 These counts involved the defendants' failure to put labels on the bottles. Unlabeled drugs are considered misbranded, 21 U.S.C. § 352(b), and misbranded drugs are not supposed to be introduced into interstate commerce. Id. § 331(b). A violation of § 331 is treated as a misdemeanor, id. § 333(a)(1), unless it is a second offense or the perpetrator acted "with the intent to defraud or mislead," which calls for imprisonment "for not more than three years or [a fine of] not more than $10,000, or both." Id. § 333(a)(2). Wood and Duchaine concede they violated § 333(a)(1) but contend there was no intent to defraud or mislead.
 
 
 28
 In United States v. Cambra, 933 F.2d 752 (9th Cir.1991), "[w]e agree[d] with the Eleventh Circuit that the 'intent to defraud or mislead' language in 21 U.S.C. § 333 may encompass both fraud on the ultimate consumer and fraud on government enforcement agencies." Id. at 755 (referencing United States v. Bradshaw, 840 F.2d 871, 874-75 (11th Cir.), cert. denied, 488 U.S. 924 (1988)).[6] Both theories were submitted to the jury. After reviewing the record in the light most favorable to the verdict, we find the record presents sufficient evidence to support both theories.
 
 
 29
 With regard to fraud on the consumer, the appellants argue they did not make any misrepresentation about the drug to buyers or users. Though they are correct in this observation, they mistakenly assume an affirmative misrepresentation is required to convict under § 333(a)(2). The following passage from United States v. Mitcheltree, 940 F.2d 1329 (10th Cir.1991) is instructive:
 
 
 30
 While the record suggests that at least one of Raymer's distributors was aware of some of the negative effects of [the drug], it nowhere suggests that the unknown third persons supplied by the coconspirators in this case were informed of the actual nature of the drug. In this large-scale distribution network, Raymer and defendant plainly knew that the [drug] would be resold without warning or accurate explanation to unknown third parties. That is sufficient evidence for a jury to find that Raymer and his coconspirators, including defendant, introduced misbranded drugs into interstate commerce with the requisite intent to mislead and defraud those who would purchase on resale. See United States v. Bradshaw, 840 F.2d 871, 874 n. 4 (11th Cir.1988). That defendants and some of their customers may have known the true nature of [the drug] does not matter; intent may be inferred from their almost certain knowledge that the misbranded [drugs] would pass to unknown third parties.
 
 
 31
 Id. at 1346 (citations omitted). In Bradshaw, upon which Mitcheltree relies (and which Cambra cited with approval), the defendant (like Wood and Duchaine) did not affirmatively mislead the buyers; he simply didn't tell his buyers about the drug's side effects. In fact, the purchasers testified "they never felt that Bradshaw defrauded or misled them." 840 F.2d at 873. Nonetheless, the Eleventh Circuit had "no trouble in ruling that the government offered sufficient evidence for the jury to find that Bradshaw intended to defraud those unknown third persons to whom Perkins and Shields would resell the drugs." Id. at 874 n. 4. We continue to endorse our sister circuits' views of § 333; the convictions in this case are to be affirmed because there was evidence the defendants knew Hudson was going to resell the drugs to unsuspecting third parties.
 
 
 32
 With regard to fraud on the FDA, the defendants contend there was insufficient evidence because they did not make misrepresentations to government officials as in Bradshaw, 840 F.2d at 873, nor did they use fictitious names as in United States v. Arlen, 947 F.2d 139, 143-44 (5th Cir.1991), cert. denied, 112 S.Ct. 1480 (1992). The flaw in their argument is they did do some of the things these defendants did, such as discussing "methods of avoiding detection with ... customers," Bradshaw, 840 F.2d at 873, and being "careful not to generate or maintain any records of [their] ... dealings." Arlen, 947 F.2d at 143-44. Moreover, with regard to Duchaine, there was evidence he stored drugs in a locker that was registered in someone else's name. Most fatal of all, of course, were statements both defendants made to Hudson, wherein they specifically stated that a label was not provided so as to avoid the FDA's scrutiny. The record contains sufficient evidence to support the jury's verdict on this theory.
 
 E. Instructional Issues
 1. Count I
 
 33
 Wood contends the jury instruction with regard to Count I was faulty because, though the jurors were told they had to find "there was a plan to commit at least one of the crimes alleged in the indictment that is an object of the conspiracy," they were not told they had to agree that the object of the conspiracy was to interfere with the FDA's lawful functions. He also complains there was no definition of intent to defraud in Count I. The government contends the jury was provided a copy of the indictment, which identified the "object of the conspiracy" as "to defraud the United States ... by interfering with and obstructing the FDA's lawful government function...." Thus, "[t]he jury was informed as to the nature of the conspiracy charge, which made it clear that the object of the conspiracy was to defraud the United States and the FDA." Resp.Br. at 45. Finally, an instruction defining "intent to defraud" was given; though it did "not specify whether it applies to the conspiracy or the substantive misbranding counts," id. at 47, it correctly defines the phrase.
 
 
 34
 Because this instruction was agreed to by the parties, we review for plain error. Fed.R.Crim.Pro. 52(b). Rule 52(b) limits an appellate court's authority to reverse for forfeited error to those situations in which there is 1) error 2) that is " 'clear' or, equivalently, 'obvious,' " and 3) that affects substantial rights. United States v. Olano, 113 S.Ct. 1770, 1777-78 (1993). The third requirement is met when the error was prejudicial; that is, "[i]t must have affected the outcome of the District Court proceedings." Id. at 1778. This is the same as the harmless error inquiry imposed by Rule 52(a), except the defendant-appellant has "the burden of persuasion with respect to prejudice." Id. We believe there was clear and obvious error, but there was no prejudice.[7]
 
 
 35
 After reviewing the instructions as a whole, United States v. Beltran-Rios, 878 F.2d 1208, 1214 (9th Cir.1989), we are most concerned with their failure to specify that the jury had to find the defendants acted with intent to defraud the government with respect to Count I.[8] It is of no help that the phrase "intent to defraud" was defined with respect to other counts because the instructions for Count I failed to state that intent to defraud was even an element of the crime charged in Count I. Thus, there is no reason to expect the jury to have known it had to find the element existed or to expect the jury to have known to apply the definition of that phrase as it appeared in the instructions relating to the other counts. Cf. United States v. Caldwell, 989 F.2d 1056, 1059 (9th Cir.1993) (stressing importance of this element with respect to § 371). Nonetheless, Wood has not persuaded us that the error prejudiced him.
 
 
 36
 The error is one of constitutional dimension, id. at 1060; consequently, we conduct the harmless error analysis set forth in Hart v. Stagner, 935 F.2d 1007, 1011 (9th Cir.1991):
 
 
 37
 The reviewing court's task is not to determine whether a reasonable jury could convict on the evidence before it or whether the reviewing court would do so based on the record as a whole. The questions it must answer are much more focused: First, based on the instructions given, what must the jury have found to convict? Second, in making those findings, did it necessarily find all the required elements of the charged crime?
 
 
 38
 The jurors were instructed that they had to find there was a conspiracy to defraud the United States or one of its agencies, and were further instructed that a conspiracy was an agreement. By returning a verdict of guilty, the jury obviously found that such an agreement existed. Out of necessity, then, the jury must have found the appellants intended to defraud the government; otherwise, it could not have found that they agreed to defraud the government. This situation is therefore not similar to that in Caldwell because there the instructional error (which was not the same error present in this case) made it possible for the jury to convict based on a theory that was not legally permissible. 989 F.2d at 1061. We conclude the instruction's failure to instruct on and define the phrase "intent to defraud" was not plain error.
 
 2. Counts II-VI
 
 39
 Wood focuses his argument on the portion of the definition that stated the necessary intent to defraud existed if he "intended to defraud federal and state enforcement agencies." His concern involves inclusion of the word "state" because state agencies were not mentioned in the indictment, so a verdict relying on defrauding state officials would be improper. Mitcheltree, 940 F.2d at 1351. The government correctly contends the instruction properly states the law, but misses the point of Wood's argument: he does not claim the statement was legally incorrect; he contends it is at variance with both the indictment (because it doesn't mention state officials) and the facts (because there was no evidence relative to state officials).
 
 
 40
 Applying harmless error analysis, Fed.R.Crim.Pro. 52(a), the instruction's reference to state government does not require reversal. A variance constitutes harmless error "if (1) the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or unfairly surprised at trial and (2) if the variance is not such that it will deprive the defendant of his protection from reprosecution for the same offense." United States v. Anton, 547 F.2d 493, 496 (9th Cir.1976). Because the government presented no evidence regarding state officials, there was no surprise during trial. The utter lack of evidence, along with the overwhelming evidence of the appellants' intent to defraud the FDA, eliminates the risk of any harm. Secondly, Wood cannot be reprosecuted even under a claim of intent to defraud state officials; the bar against double jeopardy insures this. In short, the instruction was wrong, but the error was harmless. See Fed.R.Crim.Pro. 52(a).[9]
 
 F. Sentencing
 
 41
 Duchaine contends the court improperly used the fraud guideline, § 2F1.1, instead of the food, drug, and agricultural products guideline, § 2N2.1, to calculate his sentence. He concedes Cambra affirmed the use of the fraud guideline, but attempts to distinguish that case because Cambra affirmatively misrepresented the nature of the product he sold. He also points out the FDA suffered no actual loss. We reject Duchaine's claim for several reasons. First, Commentary 2 to U.S.S.G. § 2N2.1 provides that "[i]f the offense involved ... fraud ... apply the guideline applicable to the underlying conduct, rather than this guideline." By the terms of the statute upon which it rests, Duchaine's conviction was for fraud. Second, though Cambra affirmatively misrepresented the product he sold, this fact did not motivate the application of U.S.S.G. § 2F1.1. In fact, we recently indicated that Cambra applied when the offense "involved fraud against the government." United States v. Von Mitchell, 984 F.2d 338, 340 (9th Cir.1993) (per curiam). The district court used the correct guideline.
 
 III. CONCLUSION
 
 42
 Based on the foregoing, the appellants' convictions and sentences are AFFIRMED.
 
 
 
 *
 The Honorable Floyd R. Gibson, Senior Circuit Judge from the Eighth Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 These drugs are apparently used to promote muscle gain and weight loss
 
 
 [2]
 Initially, Wood was upset that Hudson had called him at home. He hung up and called Hudson back from "a better phone."
 
 
 [3]
 The district court found Wood's housekeeper lacked authority to give the FDA agents consent to search Wood's home and, even if he had authority, he had not voluntarily consented to the search. The government does not appeal the district court's ruling
 
 
 [4]
 All future references to counts in the indictment will be to the original numbers assigned in the indictment
 
 
 [5]
 This is an important feature because it differentiates this case from United States v. Johns, 891 F.2d 243 (9th Cir.1989). In Johns, evidence from the second search was suppressed because "[t]he illegal stop was the impetus for the chain of events leading to the [drugs] and thus is too closely and inextricably linked to the discovery for the taint to have dissipated." Id. at 245-46. Even accepting the truth of Wood's assertions, the information discovered at Amino Discounters--and not the information found in Wood's house--was the impetus for the FDA's investigation into Wood's activities
 
 
 [6]
 The defendants correctly argue Cambra was a sentencing case, but incorrectly argue that this distinction renders it inapplicable here. Cambra discussed the nature of the crime described in § 333 in order to determine which Sentencing Guideline was applicable; necessarily, the case has decided the type of conduct that is punishable under the statute, and we are obligated to apply it
 
 
 [7]
 Even if there were prejudice, reversal would not be automatically required; "[i]f the forfeited error is 'plain' and 'affect[s] substantial rights,' the Court of Appeals has authority to order correction but is not required to do so." Olano, 113 S.Ct. at 1778. We make no suggestion as to whether we would have taken corrective action if the error affected substantial rights
 
 
 [8]
 We also believe the instructions should have specified the object of the conspiracy in terms similar to those used in the indictment. However, the error (assuming it is an error) is neither plain nor obvious, so reversal is not warranted under the plain error standard
 
 
 [9]
 Duchaine raises different arguments about the definition of "intent to defraud" relative to these counts, but his arguments are completely devoid of merit